RECORD NOS. 08-3037(L); 11-3032

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

**v.**

## GREGORY BELL,
### also known as Boy-Boy, also known as Bunga;
## DAVID WILSON,
### also known as Cool Wop, also known as Cootie,

*Defendants - Appellants*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

─────────────

## PAGE PROOF BRIEF OF APPELLANT DAVID WILSON
## (TRIAL ISSUES)

─────────────

**Michael E. Lawlor**
**Sicilia C. Englert**
**LAWLOR & ENGLERT, LLC**
**6305 Ivy Lane, Suite 608**
**Greenbelt, Maryland 20770**
**(301) 474-3404**

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

The Certificate as to Parties, Rulings, and Related Cases is found in the Joint

Brief of Appellants, *United States v. Gregory Bell and David Wilson*, No. 08-3037

(consolidated with No. 11-3032).

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . . . . . . i

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTES AND RULES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Pretrial Substitutions of Counsel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Cocaine distribution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Middleton and Bradley Murders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Undisclosed report stating someone else killed Middleton and Bradley . . 13

    Admission of other crimes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Uncharged Reid murder admitted as intrinsic evidence . . . . . . . . . . . . . 18

    Uncharged Phillips murder admitted under Rule 404(b) . . . . . . . . . . . . 19

    Wicks becomes ill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

The defense case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

Government's summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

Jury deliberations and verdicts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

Post-trial discovery of police interviews naming suspects other than
Middleton as Doleman's killer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

Post-trial Brady rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

SUBSTITUTION OF COUNSEL FOUR MONTHS INTO THE TRIAL
DEPRIVED WILSON OF HIS FIFTH AMENDMENT RIGHT TO DUE
PROCESS AND SIXTH AMENDMENT RIGHT TO EFFECTIVE
REPRESENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Legal principles and standard of review . . . . . . . . . . . . . . . . . . . . .   32

Forcing Wilson to proceed with counsel who was absent for one-
third of trial was structural error . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

Proctor could not effectively represent Wilson . . . . . . . . . . . . . . .   37

THE DISTRICT COURT ABUSED ITS DISCRETION IN ADMITTING
EVIDENCE OF TWO UNCHARGED MURDERS . . . . . . . . . . . . . . . .   40

Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Legal principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

The Reid and Phillips murders should not have been admitted . . . .   43

The Reid murder was outside the "narrow range of circumstances"
where intrinsic evidence may be used . . . . . . . . . . . . . . . . . . . . . . .   44

Admission of the Philips murder to show familiarity with and access to guns was an abuse of discretion . . . . . . . . . . . . . . . . . . . . 47

THE GOVERNMENT'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE MATERIAL TO THE MIDDLETON/BRADLEY MURDERS VIOLATED WILSON'S RIGHT TO DUE PROCESS . . . . . 51

Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Legal principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

The District Court erroneously held that the Carter report was disclosed in time for Wilson to use it . . . . . . . . . . . . . . . . . . . . . . . . 54

The District Court erroneously concluded that undisclosed reports naming other suspects as Doleman's killer were not material . . . . . 55

Cumulative effect of the nondisclosures . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Burdine v. Johnson*,
    262 F.3d 336 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*\*Brady v. Maryland*,
    373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 30, 31, 51, 52, 58

*\*Carter v. District of Columbia*,
    795 F.2d 116 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Giglio v. United States*,
    405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*In re Sealed Case*,
    185 F.3d 887 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52-53

*\*Kyles v. Whitley*,
    514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 58

*McMann v. Richardson*,
    397 U.S. 759 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*\*Mitchell v. Mason*,
    325 F.3d 732 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Mudd v. United States*,
    798 F.2d 1509 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*\*Denotes Authorities Chiefly Relied Upon*

*Old Chief v. United States,
      519 U.S. 172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47, 50

*Powell v. Alabama,
      287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 37, 38, 39

Sprint/United Mgmt. Co. v. Mendelsohn,
      552 U.S. 379 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

Strickland v. Washington,
      466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

Strickler v. Green,
      527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52, 58, 59

Tippins v. Walker,
      77 F.3d 682 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

United States v. Agurs,
      427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51, 52

United States v. Alexander,
      331 F.3d 116 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42, 45

United States v. Allen,
      960 F.2d 1055 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

United States v. Badru,
      97 F.3d 1471 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

United States v. Bagley,
      473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51, 53

United States v. Becton,
      601 F.3d 588 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . .  41, 43, 45

United States v. Bowie,
      198 F.3d 905 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52, 53

*United States v. Brown*,
    597 F.3d 399 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Celis*,
    608 F.3d 818 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*\*United States v. Cronic*,
    466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 34, 35, 37

*\*United States v. Cuffie*,
    80 F.3d 514 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 55, 59

*United States v. Edelin*,
    175 F. Supp. 2d 1 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*\*United States v. Foskey*,
    636 F.2d 517 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 49

*\*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36, 40

*United States v. Javor*,
    724 F.2d 831 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*\*United States v. Juan Bowie*,
    232 F.3d 923 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 40, 42, 43, 44, 46

*\*United States v. Lighty*,
    616 F.3d 321 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 49, 50

*United States v. Lloyd*,
    71 F.3d 408 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 59

*United States v. Long*,
    328 F.3d 655 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*United States v. Murray,
  103 F.3d 310 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

United States v. Myers,
  550 F.2d 1036 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

United States v. Pettiford,
  627 F.3d 1223 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51, 52

United States v. Pollack,
  534 F.2d 964 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

*United States v. Smith,
  77 F.3d 511 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

United States v. Taylor,
  139 F.3d 924 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

United States v. Wilson,
  720 F. Supp.2d 51 (D.D.C. 2010) . . . . . . . . . . . . . . . . . . . . . . .  29, 30, 54, 56

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 32, 35, 40

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 32, 39, 40

**STATUTES**

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

21 U.S.C. § 841(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

21 U.S.C. § 841(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

D.C. Code § 11-502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D.C. Code § 1805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D.C. Code § 2101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D.C. Code § 4502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**RULES**

D.C. Cir. R. 28(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 28(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 42, 43, 45, 50

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . 19, 31, 41, 42, 43, 47, 49, 50

**GUIDELINE**

U.S.S.G. § 5K1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Appellant was convicted of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(C), and aiding and abetting first degree murder while armed, in violation of D.C. Code §§ 2101, 4502, and 1805. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and D.C. Code § 11-502. Appellant was sentenced on March 11, 2011, and a timely notice of appeal was filed on March 21, 2011. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 3742(a).

## STATEMENT OF THE ISSUES

I.   Whether Wilson was denied his Fifth Amendment right to due process and Sixth Amendment right to assistance of counsel when lead counsel became ill during trial and the Trial Court forced Wilson to proceed with second-chair counsel who was appointed after trial started and another counsel appointed mid-trial who had no familiarity with the case?

II.  Whether the Trial Court abused its discretion in (1) admitting an uncharged murder as intrinsic evidence, where the government failed to show that the crime was connected to the charged conspiracy, and (2) admitting another uncharged murder to show Wilson's access to and familiarity with guns, where there was ample other evidence of the same?

1

III.    Whether Wilson was denied his Fifth Amendment right to due process by the government's failure to timely disclose (1) a police interview report contradicting the government's evidence of the shooters' identities in the Middleton/Bradley murders and (2) several police interview reports contradicting the government's theory of Wilson's motive to kill Middleton?

## STATUTES AND RULES

Pursuant to Fed. R. App. Rule 28(f) and D.C. Circuit Rule 28(a)(5), the pertinent statutes and rules are set forth in an Addendum to this brief.

## STATEMENT OF THE CASE

The Statement of the Case may be found in the Joint Brief of Appellants, *United States v. Gregory Bell and David Wilson*, No. 08-3037 (consolidated with No. 11-3032).

## STATEMENT OF FACTS

### *Overview*

The government alleged that from approximately 1992 through March 2005, the defendants conspired to distribute powder and crack cocaine and engaged in a pattern of racketeering (Dkt. 544 p. 2-3, 23-42).  According to the government, Ball was the leader, Tr. 4/2/07AM, 5176, Tr. 5/17/07AM, 11663-64, who "fronted" drugs, Tr. 5/7/07AM, 10125, defended the territory,  Tr. 4/16/08, 7145, Tr. 4/23/07AM, 8253-54, and enforced a "no snitch" code.  Tr. 5/8/07PM, 10558, Tr. 5/17/07AM,

11786-87, Tr. 5/22/07AM, 12381.  The government claimed that the defendants shared drug proceeds. Tr. 5/21/07PM, 12215-16, Tr. 4/18/07AM, 7552.

In addition to conspiracy and racketeering, each appellant was charged with numerous counts of distribution of cocaine (Dkt. 544, p. 42-46).  The government alleged the defendants committed numerous violent acts to further the conspiracy. *Id.* at 6-22.  Only some of the violent acts were charged.

Wilson was charged with aiding and abetting the murders of Ronnie Middleton and Sabrina Bradley.  The government alleged that Wilson drove the shooters to and from the scene.

Jones was charged with assault with intent to kill Michael Smallwood. According to the government, Smallwood was stabbed three times while in a fistfight with Jones.  Tr. 6/14/07AM, 15514, 15222.

The government charged that Samuels shot and killed Jamel Sills as he sat in a parked car.  According to the government, several witnesses identified Samuels as the shooter.  Tr. 5/3/07PM, 9950, 9969-71; Tr. 5/8/07AM, 10338.

Ball and Wilson were charged with murdering Trevon Shaw as he stood outside.  One witness testified that she saw Ball shoot Shaw in the head two times. Tr. 6/18/07AM, 15900-02.  The witness testified that she heard a third gunshot and saw Wilson, holding a gun, walk away from Shaw's body. Tr. 6/18/07AM, 15903-05.

The jury found all defendants not guilty of both drug conspiracy and racketeering conspiracy. With one exception, all of the defendants who went to trial were not found guilty of the violent charged offenses and found guilty of between one to three cocaine distributions. The exception was Wilson, who was the only defendant convicted of murder–of Middleton and Bradley.

### *Pretrial Substitutions of counsel*

The Court appointed Cynthia Katkish at Wilson's arraignment on March 24, 2005 (Dkt. 27). Because the government could seek the death penalty for the VICAR counts, the Court appointed William Garber to assist Katkish (Dkt. 152). A few months later, Jenifer Wicks replaced Garber as second counsel (Dkt. 182). For the next year, Katkish and Wicks investigated and represented Wilson. The District Court ruled on November 6, 2006, that defendants could continue to have two lawyers each even if the government no longer sought the death penalty because "there is a fairly high level of complexity with respect to the evidence that's been alleged in the case involving, at minimum, multiple or other overlapping conspiracies and potentially multiple predicted overt acts alleged in the indictment." Tr. 11/6/06, 6.

Katkish and Wicks continued to investigate the case until a conflict of interest surfaced concerning Katkish. Approximately two months before trial, the government identified a potential witness against Wilson whom Katkish had

represented previously (Dkt. 630).  In a hearing approximately three weeks before trial, Wilson requested appointment of counsel to replace Katkish and a continuance–so Wicks could prepare as lead counsel and new counsel could become familiar with the case.  Tr. 1/23/07, 5; (Dkt. 697).

Wicks requested a continuance of the trial, reiterating that two counsel were needed and Wilson effectively had only one counsel since the conflict was discovered.  (Dkt. 701).  Wicks stated, "[e]ven as short as a week or two would help counsel tremendously."  *Id.*  No other defendant objected, *id*, but the  government opposed the continuance, citing the resources expended in preparation of the anticipated trial date.  (Dkt. 703).

On February 5, 2007, the Trial Court agreed to appoint new counsel, but refused to delay the February 13 trial date.  (Dkt. 717).  Gary Proctor became Wilson's second counsel, *nunc pro tunc* to February 2, 2007.  (Dkt. 741).[1]  Proctor accepted the last minute appointment with the understanding that he would play only a supporting role to Wicks, and that he could maintain his existing caseload during the trial.  (Dkt. 1016 p. 3).  Proctor was out of the courtroom for significant parts of the trial, tending to his caseload and performing tasks Wicks assigned to him.  *Id.*

---

[1]  Wicks first approached Proctor on February 2, 2007, to assist in Wilson's case.  (Dkt. 1016 p. 2).

### *Cocaine distribution*

On each of the cocaine distribution convictions, as with the other defendants, the government presented testimony of a cooperator who made a controlled audio recorded purchase of crack cocaine from Wilson.  The cooperators were Sandra White (Counts 4 and 6) Tr. 3/12/07PM, 2516-19, 2528-29; Season Wood (Counts 16 and 55), Tr. 2/28/07PM, 890, 917; Gail Parson (Counts 19 and 20) Tr. 3/7/07AM, 1932-33, 1952-54; and Darlene Irving (Count 21) Tr. 3/28/07AM, 4678-82.   Each cooperator described the transaction and identified Wilson's voice on the audio tape.

### *Middleton and Bradley murders*

The government claimed a feud began in 1993 when Congress Park member Maurice Doleman (Reecey) robbed an 1-5 Mob member's girlfriend and her uncle. Tr. 3/29/07PM, 5081-88, 5092.  In retaliation, Tommy Edelin, leader of the 1-5 Mob, instructed James Faison to kill Doleman.  Tr. 5/24/07PM, 13036-40, 13060.  About two weeks later, Faison and Ronnie Middleton looked for Doleman in Congress Park but did not find him and Faison went drinking at Monkey Mark's house.   Tr. 5/24/07PM, 13061, 13064.  Shortly before midnight, Middleton came into the house breathing hard, excited, and said that he had just killed Doleman.  Tr. 5/24/07PM, 13075-77.  Wilson had been close to Doleman and, according to the government, sought to avenge Doleman's death.  Tr. 2/21/07AM, 71-72, 74-75, Tr. 10/3/07PM, 22730.

Five years after Doleman's death, Middleton and his girlfriend Sabrina Bradley were shot as they sat in Middleton's Ford Bronco. Bradley's cousin, Patrice Johnson, testified that on August 17, 1998, she awoke to the sound of gunshots and from her window saw someone she knew as Teeny Man (Michael Smith) running on the street. Tr. 6/7/07AM, 14554-56. Smith came to her door, appearing "shaky, nervous." Tr. 6/7/07AM, 14560. Smith said he was in the truck with Bradley and Middleton when two people dressed in black, wearing masks, came up and shot them. Tr. 6/7/07AM, 14581-82. Smith jumped out of the back of the truck and escaped. Tr. 6/7/07AM, 14582-83.

Middleton, though wounded, managed to drive his truck to the Seventh District Police Station, nearly crashing into the front glass door. Tr. 6/7/07PM, 14626-28, 14635-38. There were numerous bullet holes in the truck, all entering from the passenger side. Tr. 6/7/07PM, 14765. Middleton and Bradley were transported to D.C. General Hospital.

Torran Scott had a daughter with Bradley and, although they broke up in 1995, maintained a good relationship. Tr. 6/12/07PM, 1501-02. On the morning of the shooting, Scott received a call at approximately 3:30 a.m. from Bradley's mother, who said that Bradley had been shot. Tr. 6/12/07PM, 15115-16. Scott went to D.C. General Hospital where he learned that Middleton had died. Scott left the hospital at

approximately 5:30 a.m. while Bradley was in surgery.   Tr. 6/12/07PM, 15116-17, 15120.

It was raining that morning, but when he arrived home around 6:00 a.m., it had stopped.   Tr. 6/12/07PM, 15116, Tr. 6/13/07AM, 15281. As Scott pulled up to his home, he saw Antonio Roberson with Wilson, and told them Middleton was dead. Tr. 6/12/07PM, 15117.  Roberson bragged about shooting up Middleton's truck.  Tr. 6/12/07PM, 15118.   When Scott told them that Bradley was in the truck with Middleton, Wilson's eyes widened and he said, "[s]top playing."  Tr. 6/12/07PM, 15118-19.  Wilson never said that he was present at the shooting.  Tr. 6/13/07AM, 15296.

According to Scott, Roberson and Wilson returned that evening.  They had been drinking and both said that they did not know Bradley had been in the truck. Tr. 6/12/07PM, 15120-21, Tr. 6/13/07AM, 15161-62.  Scott claimed that a week later, Wilson said that police were questioning him about the murders and wanted Scott to say that Wilson was with him that night.  Tr. 6/13/07AM, 15168.

Immediately after the murders, Scott did not behave as though he believed Wilson was involved in Bradley's death.  When Scott married in 1999, shortly after Bradley's murder, Wilson was permitted to attend Scott's wedding reception.  Tr. 6/13/07AM, 15273-75.  Scott did not implicate Wilson in the murders for more than four years, until he (Scott) was charged with narcotics conspiracy and faced ten years

8

to life in prison. Tr. 6/13/07AM, 15253-54, 15275. Scott admitted he was unsure whether he told investigators that Little Terrence, not Wilson, had been with Roberson outside his home on the morning of the shooting. Tr. 6/13/07AM, 15253-54. Two days after meeting with the government, Scott pleaded guilty and was released to await sentencing. Tr. 6/13/07AM, 15260.

Renee Cottingham testified that Wilson was the former boyfriend of one of her daughters and that she (Cottingham) maintained a friendly relationship with Wilson. Tr. 6/13/07PM, 15367-70. Cottingham would cook for him, take care of his dog, and do his hair–which he wore in corn rows then. Tr. 6/13/07PM, 15370-71. Cottingham testified that one day in 1998 around noon, she was working on Wilson's hair when she heard him say, "[s]he shouldn't have been there, she should not have been there, I killed her, she's dead." Tr. 6/13/07PM, 15378-79. Wilson indicated that two men were with the woman and one of them jumped out of the window and ran. Tr. 6/13/07PM, 15382-83. Cottingham noticed it had rained the day before and Wilson's hair was moist. Tr. 6/13/07PM, 15378.

Cottingham did not report Wilson's statements to the police until 1999 or 2000, when police interviewed her regarding the death of her brother, killed in December 1998. Tr. 6/13/07PM, 15385; Tr. 6/13/07PM, 15385-86, 15405. On cross-examination, Cottingham denied hearing rumors that Wilson was involved in her

brother's murder; denied she held Wilson indirectly responsible; and denied harboring any anger toward Wilson. Tr. 6/13/07PM, 15397-98, 15409, 15422.

Cottingham was then confronted with her grand jury testimony stating that she thought Wilson was involved in the murders of her brother and nephew. Tr. 6/13/07PM, 15398, 15409. Wilson was close friends with her brother's killer–Vincent Honeycutt, and Wilson had testified for Honeycutt at the trial concerning her brother's murder. Tr. 6/13/07PM, 15411, 15408. Although she had denied it minutes earlier, Cottingham admitted that she believed Wilson was involved in her brother's death. Tr. 6/13/07PM, 15409-10.

Bobby Capies testified that Wilson talked about wanting to "get[]" Middleton, and confessed his involvement in Middleton's murder. Tr. 3/29/07PM, 5095-96, 5112. According to Capies, Wilson said that upon spotting Middleton in a truck, he, Roberson, and Draine went to get Roberson's gun. Tr. 3/29/07PM, 5112. On the way back, Roberson and Draine argued over who would do the shooting. Tr. 3/29/07PM, 5114-15, 5140, 5142. Roberson said, "[m]an, it's my gun, I'm going to do it." Tr. 3/29/07PM, 5114-15. Roberson pulled on his hood, ran across the street approaching the truck from the driver's side, Tr. 3/29/07PM, 5115, Tr. 4/2/07AM, 5143, and opened fire on the driver's side. Tr. 4/4/07PM, 5883. After the shooting stopped, Teeny Man jumped out of the back of Middleton's truck. Tr. 3/29/07PM, 5115. Capies claimed Wilson said that he would not have let Roberson do that if he knew

10

Bradley was in the truck.  Tr. 3/29/07PM, 5116-17.  They followed Middleton's truck until it headed in the direction of the police station.  Tr. 4/2/07AM, 5145-46.  Capies testified that he also talked to Roberson, who relayed the same details about the murders. Tr. 4/2/07AM, 5159-60.

Capies admitted that he had lied repeatedly. Tr. 4/5/07AM, 6121-22 (lied about Bobbie murder); Tr. 4/11/07PM, 6503-11 (numerous lies about Chandler murder); Tr. 4/11/07AM, 6489 (lied repeatedly to law enforcement); Tr. 4/11/07AM, 6490 (admitting lying); Tr. 4/11/07AM, 6491-93 (lying about Chandler murder); Tr. 4/12/07AM, 6675 (lying to the government in a proffer); Tr. 4/12/07AM, 6678 (lying to detective); Tr. 4/12/07AM, 6680 ("I lied to them a lot," referring to the FBI and Assistant United States Attorney).

Capies admitted he had previously allowed three people to spend several months in jail for a murder he committed.  Tr. 4/2/07PM, 5339; Tr. 4/3/07AM, 5405-08; Tr. 4/11/07AM, 6478-80.  Capies also admitted his involvement in the Reginald Reid killing but implicated another man and offered to kill that person for money.  Tr. 4/11/07PM, 6542-44.  Capies had committed numerous armed robberies, and had shot at many people.  Tr. 4/11/07AM, 6392-6393, 6446, 6579-82.

Capies, who had pleaded guilty to a RICO conspiracy involving cocaine distribution and aiding and abetting first-degree murder, would be sentenced to life

imprisonment unless the government made a motion for a reduced sentence under § 5K1.1 of the United States Sentencing Guidelines.  Tr. 4/3/07PM, 5626-30.

Kairi Kellibrew testified that Wilson admitted his involvement in the Middleton/Bradley murders but Kellibrew gave an account inconsistent with that of Capies.  According to Kellibrew, Wilson received a call informing him of Middleton's location.  Wilson drove with Roberson and Draine and found Middleton and Bradley standing there. Tr. 5/8/07PM, 10459-60.  Roberson and Draine "jumped out, wore them out, jumped back in." Tr. 5/8/07PM, 10460-61.  Kellibrew asserted that Wilson said that Middleton and Bradley were standing on the street.  Tr. 5/8/07PM, 10696.  Kellibrew testified that this conversation occurred in 2002, approximately four years after the murders.  Tr. 5/9/07AM, 10698.

Kellibrew admitted he was disgruntled because Wilson was chosen over him to be in the wedding of Antwuan Ball, who was Kellibrew's cousin.  Tr. 5/8/07PM, 10519-20.  Kellibrew also bore a grudge against Wilson, who did not lend his gun to Kellibrew when Kellibrew was being chased by someone with a gun.  Tr. 5/8/07PM, 10538, 10541-42.

Kellibrew conceded that he was involved in countless robberies.  Tr. 5/9/07AM, 10653.  When he was caught selling drugs, Kellibrew gave the drugs to his girlfriend and tried to get her to take the charge for him.  Tr. 5/14/07PM, 11022.

12

Kellibrew used heroin and PCP to the point where he sometimes blacked out.  Tr. 5/9/07PM, 10773-74.

Kellibrew admitted that he had lied repeatedly–to the grand jury, to the police, and again to the grand jury even after signing a plea agreement.  Tr. 5/8/07PM, 10700-03. Tr. 5/9/07PM, 10719-26.  Despite his repeated lies, the government did not rescind his plea agreement.  Tr. 5/14/07PM, 11035-40.  Kellibrew pleaded guilty to racketeering conspiracy and was facing a possible sentence of 30 years to life imprisonment.  Tr. 5/7/07AM, 10102.  Kellibrew hoped that after his testimony, the government would move for a reduced sentence in his case.  Tr. 5/7/07AM, 10106, Tr. 5/14/07PM, 11112-13.

Roberson, Draine, and Smith were dead by the time of Wilson's trial.

### *Undisclosed report stating someone else killed Middleton and Bradley*

On May 22, 2007, after three months of trial, the government disclosed a police report memorializing a statement Smith made to prosecution witness Bradley Carter. (Dkt. 947).  Carter told Detective Konstantinos Giannakoulias that shortly after the shooting, Smith said that Aman Ball and Joseph Jones were the ones that shot Middleton and Bradley.  The police report recounted Carter's statement:

> On the day of SQUID (Ronnie Middleton) and SABRINA'S (Sabrina Bradley) funeral, he drove to the funeral home with TEENY MAN (thought to be Michael Antonio Smith DOB: 5/15/76).  TEENY MAN was driving a white ford Tempo and CARTER was the passenger. TEENY MAN told CARTER that they walked up on the car and started

> shooting. TEENY MAN stated that AMAN (thought to be Aman Sahlee
> Ball, DOB: 4/3/74) and JOE JOE (thought to be Joseph Leon Jones,
> DOB: 10/26/70) from Congress Park shot SQUID and SABRINA.
> When AMAN and JOE-JOE started shooting, TEENY MAN hid in the
> back seat until the shooting stopped. Once the shooting stopped,
> TEENY MAN jumped out the back of the Bronco and ran.

(Dkt. 947-1). Wilson moved for a mistrial or dismissal of the Middleton/Bradley

murder counts, arguing that the principal witnesses to the murders, Capies and

Kellibrew, had already testified and defense counsel did not have the opportunity to

cross-examine them with the report's information. Moreover, the defense had not

investigated Aman Ball and Joseph Jones as alternative suspects. (Dkt. 947, p. 1, 6-

7). Counsel informed the Court it had taken months to interview the

Middleton/Bradley homicide witnesses. Unaware of Carter's statement, counsel

never questioned witnesses about Ball and Jones as alternative suspects. Counsel

said it would be impossible to investigate and re-interview the witnesses during trial.

(Dkt. 947, p. 6, Dkt. 957, p. 5). Had they known about Smith's statement, counsel

would have referenced it in opening statements; but now it would be implausible to

weave the evidence into a coherent defense strategy. *Id.* The District Court deferred

ruling until after trial.

After the disclosure, the government called Carter to testify about a shooting,

which he professed not to remember. Tr. 5/30/07AM, 13452-54. The prosecutor

argued that Carter's memory loss was contrived, and the Court admitted Carter's

14

grand jury testimony detailing an incident in which Ball and Jones shot at him.  Tr. 5/30/07AM, 13463, 13480-83, 13498-99; Tr. 5/30/07PM, 13501-03, 13506; 13497. Carter previously told the grand jury he believed the shooting was related to Doleman's murder and the feud that ensued.  Tr. 5/30/07PM, 13542-43.

Because the Court admitted evidence that Carter had previously testified about the Doleman murder, Wilson attempted to question him regarding Smith's statement. Tr. 5/31/07AM, 13640.  But the Court, finding it beyond the scope of direct-examination, prohibited counsel from asking about the substance of Carter's statement.  Tr. 5/31/07AM, 13641.  Wicks made clear that she would recall Carter in the defense case.  She stated, "I don't want this witness released from the subpoena, because, for many different reasons, I plan on recalling him in my case." Tr. 5/31/07AM, 13641-42.

The defense attempted to use the information in cross-examining Patrice Johnson, who had spoken with Smith on the night of the shooting.  The government's objection to cross-examination on the content of the information was sustained by the Court which held, "without more of a basis for believing that this witness indeed can corroborate the *Brady* that you might want to get out, I think it's just too unfair to Jo-Jo [Joseph Jones] at this point."  Tr. 6/7/07AM, 14608-13.

15

### *Admission of other crimes*

Before trial, the government gave notice of intent to introduce other crimes evidence against Ball, Wilson, and Samuels (Dkt. 284).   As to Wilson, the government sought to admit that he fatally shot Sam Phillips.  *Id.* at 11.  According to the government, "Wilson committed this murder because he and Phillips each have a daughter by the same woman." *Id* at 11.[2]

In a supplemental pleading, the government sought in addition, to introduce evidence that Wilson killed Reginald Reid on December 17, 2000 (Dkt. 570, p. 4).  The government proffered that Wilson and Thurston broke into the apartment of a drug dealer, Cedric Conner, intending to rob him of drugs and money.  *Id.*  But Reid, not Conner, was in the apartment, and he was shot.  *Id.*

The supplemental pleading characterized the other crimes evidence as intrinsic to the charged crimes.  The government claimed the Reid shooting "was committed in an effort to enrich certain members of the organization, as well as weaken another drug dealer.  It is also evidence of the relationship between several members of the Congress Park Crew." *Id.*  The government assured the Court that, "[t]he government does not intend to 'prove up' the entire Phillips murder at trial.  Rather, it intends

---

[2]  Wilson was tried and acquitted of Phillips's murder in the Superior Court of the District of Columbia.

16

merely to have CW [cooperating witness] discuss the murder in the normal presentation of his trial testimony." *Id.* at 6.

The District Court found that the Reid murder was admissible  intrinsic evidence:

> It seems to me that the evidence that's the subject of the government's motion breaks down into two categories of evidence.  One category of evidence is evidence essentially of the development of relationships among the alleged co-conspirators to show the way that the alleged conspiracies grew and were formed and developed, as well as evidence of prior conspiratorial conduct among the alleged conspirators that would be corroborative of the defendant's entry into the charged agreements in the indictment.  That kind of evidence, it seems to me, would be intrinsic evidence to the charged indictment, and I believe the . . . murder of Reginald Reid would fall into that category and need not be analyzed under 404(b).

Tr. 1/22/07, 94.

Turning to the Phillips murder, the Court rejected the government's argument that it was intrinsic.  Tr. 1/22/07, 95.  The Court admitted the evidence, holding that: (1) there was sufficient evidence to support a finding that Wilson committed the murder; (2) the murder showed Wilson's access to and familiarity with weapons, which was material to the charged offenses involving weapons; and (3) that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.  Tr. 1/22/07, 96-98.

17

### *Uncharged Reid murder admitted as intrinsic evidence*

Bobby Capies testified that Cedric Conner supplied cocaine to him and other drug dealers in Congress Park. Tr. 4/2/07AM, 5237-38, 5244. Capies claimed that Wilson instigated a plan to rob Conner. Tr. 4/2/07AM, 5244, 5246-48. In December 2000, Capies, Wilson, and Thurston drove to Conner's apartment; only Wilson was armed with a gun. Tr. 4/2/07AM, 5250-51. Capies stayed in the car while Wilson and Thurston went to Conner's apartment. Tr. 4/2/07AM, 5253-54. Capies claimed that when they returned about ten minutes later, Wilson said he didn't get anything, but thought he shot someone. Tr. 4/2/07AM, 5256-57. A few days later, they planned another way to get Conner's money. They would tell Connor that a person named L.A. killed Reid, and Capies would offer to kill L.A. for money. Tr. 4/2/07AM, 5266-68.

Connor testified that he received kilogram shipments of powder cocaine, converted it to crack, and sold it to other drug dealers. Tr. 4/24/07AM, 8283-84. Connor served his customers from an apartment that he later subleased to Reid. Tr. 4/24/07AM, 8285-88. Conner claimed that a few days after Reid's murder, Wilson told him that a guy named L.A. murdered Reid. Tr. 4/24/07AM, 8306. A few minutes later, Capies approached and offered to kill L.A. for money. Tr. 4/24/07AM, 8308.

The government then called Reid's mother to testify about the apartment, Tr. 4/25/07PM, 8750; the medical examiner to testify about the autopsy, Tr. 4/25/07AM, 8760; and the evidence technician to discuss the bullets, shell casings, and fingerprints recovered from the Reid murder scene, Tr. 4/26/07PM, 8984. None of the fingerprints matched that of Wilson. Tr. 4/26/07PM, 9024.

### *Uncharged Phillips murder admitted under Rule 404(b)*

Larry Brown claimed that he saw Wilson shoot Sam Phillips. On February 6, 2001, Wilson told Brown that "some dude" that just came home from jail was trying to kill him (Wilson). Tr. 3/5/07AM, 1396-99. Brown agreed to give Wilson a ride to the Hope Village halfway house in Southeast, D.C. Tr. 3/5/07AM, 1402-04. Before leaving, Brown took a gun from under the driver's seat of the car and gave it to Wilson. Tr. 3/5/07AM, 1405. When they arrived at the halfway house, three men were outside, and Wilson said "that's him right there." *Id.* As Wilson got out of the car, he asked, "is your name Sammy?" Two of the men kept walking and one stopped to talk to Wilson. Tr. 3/5/07AM, 1406. They talked for approximately 30 to 40 seconds and then Wilson shot the man in the chest. Tr. 3/5/07AM, 1407. Wilson walked back to the car, got in, and said "my fault." Tr. 3/5/07AM, 1408. At that point, the Judge instructed jurors that the Phillips homicide was not charged in this case and that the evidence was being admitted for a limited purpose. Tr. 3/5/07AM, 1408-09.

19

Although the government previously indicated that Brown was its only witness for the Phillips murder, it changed course after Brown testified. Over Wilson's objection, the government called Geneva McCoy, a halfway house employee, to testify that she was at the scene. Tr. 3/21/07AM, 3512, 3518. She recalled seeing a small white car pull up and someone get out of the passenger seat. Tr. 3/21/07AM, 3518-29. She heard a loud pop, someone fell to the ground, and the person who got out of the car got back into the passenger seat. She saw him put something silver into his pocket. Tr. 3/21/07AM, 3525-26. McCoy could not identify the shooter's face but said it was a man, slim, and about 5'5" to 5'7' tall. Tr. 3/21/07AM, 3529-30, 3535.

Over Wilson's objection, the government elicited from Capies that Wilson confessed the Phillips murder to him; "[h]e told me he killed him in the morning." Tr. 4/3/07PM, 5610-12. Capies testified, "Wop was like, 'Man, you know I just left the lane. You know I punished Slim.'" Tr. 4/3/07PM, 5616-17. Capies claimed that "I punished Slim" meant that Wilson killed Sam. Tr. 4/3/07PM, 5616. Capies testified that a few days later, Wilson warned him that Phillips had friends so they needed to be on their guard. Tr. 4/3/07PM, 5620-22. Capies claimed that before the shooting, Wilson said he had heard that Phillips planned to shoot Wilson so Wilson needed to get Phillips first. Tr. 4/3/07PM, 5617-18. Finally, the government presented evidence of how the crime scene was processed. Tr. 7/10/07AM, 17091.

20

### Wicks becomes ill

For four months, Wicks carried the primary responsibility for Wilson's defense. Of the 87 government witnesses presented during that time, Proctor cross-examined only one significant witness–James Faison, and four minor witnesses.[3]  Proctor primarily did research, drafted motions, printed and photocopied documents, and made calls on administrative trial matters. *Id.*

Wicks became severely ill and was hospitalized on June 21, 2007, with chest pains and extremely high blood pressure.  (Dkt. 1016).  While waiting for a prognosis, Proctor filed a brief stating candidly that he would not be able to provide effective representation without Wicks because he had little federal trial experience, having second-chaired only one other federal trial to its conclusion.  (Dkt. 1016 p. 2, 4).  Proctor appealed to the Court to consider the circumstances of his sudden appointment to play a limited role in Wilson's defense.  *Id.* at 2-3, 5-6.  In addition to performing many tasks outside the courtroom, Proctor went to Ireland for several

---

[3]  Proctor cross-examined the following witnesses: (1) Medical Examiner Marie-Lydie Pierre Louis, who testified about the Troy Lewis autopsy report; (two transcript pages, Tr. 4/25/07PM, 8824-26); (2) Evidence Technician John Allie, regarding the Reginald Reid murder scene (nine transcript pages, Tr. 4/26/07PM, 9024-33); (3) Chemist Gwny Reel (two transcript pages, Tr. 5/2/07AM, 9551-53); (4) James Faison, who testified about drugs and violence in Congress Park (27 transcript pages, Tr. 5/29/07AM, 13142-13169); (5) Officer Craig Royal, who testified about disposal of seized evidence (four transcript pages, Tr. 5/30/07AM, 13399-403). Proctor also briefly argued a motion regarding Andre Morgan, Tr. 5/16/07PM, 11577, but asked no questions as a result of the court's ruling.  Tr. 5/16/07PM, 11590-91.

21

days because of a death in his family. *Id.* at 3. Proctor had met alone with Wilson only once before Wicks' illness and had never dealt with the vast majority of potential defense witnesses. *Id.* at 3-4. Proctor feared that he would risk violating several rules of professional conduct if forced to assume responsibility for Wilson's defense. *Id.* at 4-5.

By the time the District Court held a hearing on June 25, 2007, Wicks' doctor had ordered her not to return to trial work for six months. (Dkt. 1023, Exh. 1). Proctor moved to sever Wilson's case. Tr. 6/25/07AM, 16526. The government opposed, arguing that only five or six days remained in the government's case and that a retrial of Wilson would take approximately three months. *Id.* at 16528-29.

The District Court granted Wilson's severance motion:

> [I]f we were to proceed at this point with the state of a fairly damning evidence against the two lead defendants, and I'm only looking at the moment, against Mr. Wilson, with the state of the preparedness that Mr. Proctor has articulated at this point, and, again, I don't think anybody's in a position to rebut his description of it, I think that Mr. Wilson's defense would be far more challenged if he did not have an opportunity to have the kind of continuing, well thought-out, well prepared and obviously diligently prepared counsel that Ms. Wicks had provided up until this point. . . .

> [F]or Mr. Wilson to be able to effectively mount, not just a defense to the remainder of the Government's case, but to also be able to carry forward with the conceptualization of the proper affirmative defense to put on in the defense case, assuming one's put on, and an ability

22

to effectively argue to the jury. It seems to me that Ms. Wicks' absence . . . would frankly be crippling to Defendant Wilson's ability to proceed at this point.

Tr. 6/25/07AM, 16564-66.

I think in balancing the consideration I've just articulated, those considerations probably have to yield to the interest of being able to have one of the two lead defendants, who had been represented by very able counsel, who had been in on the investigation and theorizing about the best kind of defense to put forward for the level of evidence against him no longer available, ultimately I think that combination of factors and the fact that it's unlikely that we'll be able to get, in the short period of time we have now, counsel to help out Mr. Proctor and perhaps rebuild the kind of defense that Mr. Wilson will obviously need, I think those factors and the others that I mentioned have tipped the balance.

So I think the fairest thing to do is to grant the motion for severance . . .

Tr. 6/25/07AM, 16567-68.

The government refused to accept the ruling and argued that the Court should gather more information about Wicks' health, and that another attorney could be appointed to assist Proctor. *Id.* at 16569-70. The government proposed a one or two week continuance for Proctor to prepare for the remainder of the government's case-in-chief; then break again before the defense cases. It proposed allowing Wilson to present his case last, giving Proctor a total of one-and-a-half months to prepare. Tr. 6/25/07AM, 16572-73.

23

Proctor responded:

> The government's proposal basically suggests that I take the two years
> that Ms. Wicks spent preparing for this case, working it up, interviewing
> witnesses, liaisoning with her investigator, talking to experts
> and compress that into a month and a half.  I don't see how it's feasible.
> . . .

Tr. 6/25/07AM, 16576.  Ball's counsel, Steven Tabackman, added, "I don't think Mr.
Proctor, no matter how hard he worked over the next two months with the most
diligent assistance that he could, can do what Mr. Wilson needs. . . . "  Tr.
6/25/07AM, 16581.   But the District Court found the government's proposal
"eminently fair" and decided to gather more information about Wicks's health and the
possibility of finding another lawyer before making a decision.  Tr. 6/25/07AM,
16582.

When the District Court reconvened two days later, Proctor protested:

> [i]t's hard to see at this juncture how another lawyer can be anything
> other than a crash test dummy.  We are so far into this case, so much
> water has passed under the bridge, that it would be a sham, it would be
> no more than that, unfortunately.

Tr. 6/27/07AM/PM, 10.  Based on his time records, Proctor said he had attended
approximately two out of every three trial days.  *Id.* at 11-12.  Eduardo Balarezo,
Samuels' counsel, commented that forcing Wilson to go forward with Proctor and
another lawyer would be a miscarriage of justice.  Tr. 6/27/07AM/PM, 15-19.

Nonetheless, the District Court reversed its ruling:

> For reasons that I stated on the record, I granted the severance motion unconvinced that requiring Mr. Wilson to proceed on Tuesday would equip him with effective representation going forward. The government asked me to reconsider and the government suggested appointing replacement counsel and taking a sufficient recess to permit new counsel and Mr. Proctor to prepare for the end of the Government's case and the rest of the trial.
>
> . . . I do find that that has now tipped the very close balance I described on Monday. The weighty burdens I described on Monday that the severance and separate retrial would impose now outweigh what I now find to be a diminished risk to the effective representation of Mr. Wilson that we will be able to achieve with the representation and the enhanced representation and the schedule that we've set forward.

Tr. 6/27/07AM/PM, 46-48. The Court acknowledged that Wilson maintained his objection even if he accepted appointment of counsel. Tr. 6/27/07AM/PM, 54.

The next day, Matthew Davies was appointed as co-counsel for Wilson. Tr. 6/28/07AM, 16652. The Court recessed until July 9, 2007, so Proctor and Davies could prepare for the remaining government witnesses. Tr. 6/27/07AM/PM, 16680-82. The government's case-in-chief resumed on July 9, 2007, and concluded on July 17. Tr. 7/17/07PM, 18626. Wilson made no substantive oral arguments supporting a motion for judgment of acquittal and submitted on the record. Tr. 8/1/07AM, 18679, 18745, 18765. The court recessed for another three weeks to give Proctor and Davies time to prepare Wilson's defense. Tr. 8/1/07AM, 18798.

### *The defense case*

Melvin Givens testified that he was friends with Wilson, Draine and Middleton and knew Roberson.  Tr. 9/17/07AM,  21028-32.   On the morning of the Middleton/Bradley shooting, Givens saw Roberson and Draine sitting in Draine's two-seater 280ZX, with no one else.  Tr. 9/17/07AM, 21032-33, 21037-39. Givens, who was walking home, looked back, saw Roberson raise his hand on a white Bronco, and heard shots.  Tr. 9/17/07AM, 21041.  Givens saw someone jump out of the back window, and the truck sped off.  Tr. 9/17/07AM,  21044-45.  Givens did not see Wilson at all that evening.  Tr. 9/17/07AM, 21047.   Later that day, Givens learned that Middleton and Bradley had died.  Tr. 9/17/07AM,  21054.  Givens admitted he was serving a 25-year sentence for assault and weapons offenses.  Tr. 9/29/07AM, 21076-79.

Special Agent Kevin Ashby testified that in a debriefing, Scott said when he arrived home from the hospital on the morning of the Middleton/Bradley shooting, Little Terrence, and not Wilson was outside with Roberson.  Tr. 9/29/07PM, 21293-94.

### *Government's summation*

In closing arguments, the government asserted several times that Wilson was very close to Doleman, and for five years wanted to kill Middleton in retaliation.  Tr. 10/3/07AM, 22713, 22720-23; Tr. 10/3/07PM, 22729-31.

26

The government asserted Wilson's role as a killer in the Reid and Phillips murders.[4]  Devoting four transcript pages to the Reid murder, the government stated, " . . . you've seen the pictures. Reginald Reid . . . shot seven times . . ."  Tr. 10/3/07PM, 22801, 22799-02.  The government also highlighted the Phillips murder:

> [Y]ou heard about David Wilson's access to guns . . . We're talking about . . . the murder of Sam Phillips. . . . Larry Browne told you about that. . . . He told you how he saw Wilson take that gun, go up to a group of three men, talk to one for about 30 to 40 seconds, shoot him once in the stomach, gets back into Browne's car and says "my fault."

Tr. 10/3/07PM, 22802-03, 22802-04.

### Jury deliberations and verdicts

The jury began deliberations on October 16, 2007.  On November 8, 2007, the jury indicated it was having difficulty reaching a verdict on some counts.  The jury sent a note stating, "[p]lease provide clarity slash advice on what to do if, slash, when jurors are unable to make a unanimous decision with regard to any specific count."  Tr. 11/8/07PM, 4.  The Court responded that the jury could proceed to counts on which they could agree, and then let the Court know if there were counts on which they could not make a unanimous decision.  Tr. 11/8/07PM, 5.

On November 27, 2007, the jury sent two notes.  The first note stated, "Dear Judge Roberts, on the verdict form it reads first and second degree murder.  May we

---

[4] Before closing arguments, the Court instructed jurors to consider the Phillips murder for the limited purpose of deciding whether Wilson "had access to firearms and a facility with using them."  Tr. 10/3/07AM, 22656-57.

27

have a verdict form that says aiding and abetting?"  Tr. 11/27/07PM, 4.  Twenty minutes later, the jury sent a second note stating, "Dear Judge Roberts, we are hung on Counts 31, 33, and 37.  We have decided on all others [sic] counts.  What instructions do you have for use? [sic]" Tr. 11/27/07PM, 4.  The Court denied Wilson's motion for mistrial on Counts 31 and 33.  Tr. 11/27/07PM, 16-17.  Over objection, the Court sent a special verdict form specifying aiding and abetting with respect to the Middleton/Bradley murders.  Tr. 11/27/07PM, 10.  Shortly thereafter, the jury returned with its verdict.

Ball was convicted of one count of distribution of crack and acquitted of all other charges; Bell was convicted of three counts of crack distribution and acquitted of all other charges; Jones was convicted of two counts of crack distribution and acquitted of all other charges; Thurston was convicted of two counts of distribution of crack; and the jury deadlocked on the murder charge against Samuels.  Wilson was convicted of two counts of murder, seven counts of cocaine distribution, and one count of unlawful use of a communications facility.

### Post-trial discovery of police interviews naming suspects other than Middleton as Doleman's killer

After trial, Wilson obtained reports summarizing police interviews in the Doleman murder investigation previously disclosed by the same U.S. Attorney's

Office to counsel in *United States v. Tommy Edelin*.  Three of the four reports identified people other than Middleton as Doleman's killer.  (Dkt. 1233).

In one report, Maurice Willis told police that Antwuan Ball might have thought he (Willis) killed Doleman, but the word on the street was that a person named Asay (Calvin Smith) killed Doleman.  (Dkt. 1233-4).  Another report said that Korey Donell Watkins, Doleman's sister's boyfriend, asked Middleton if he (Middleton) shot Doleman.  Middleton said no, "Cooler" (Antwanne Johnson) did.  *Id*.  In a third report, Antwanne Johnson told police that he saw a person named Shawn shoot Doleman. *Id.*

### *Post-trial Brady rulings*

Wilson sought a new trial because of the government's late disclosure of the Carter report and its failure to disclose the alternative suspects in Doleman's murder.  The District Court held that the police report should have been disclosed before trial, but the evidence did not necessarily exculpate Wilson.  *United States v. Wilson*, 720 F. Supp. 2d 51, 67 (D.D.C. 2010).  The Judge said the report discredited the government's theory that Roberson and Draine were the shooters, but it "less directly" undercut the government's theory that Wilson was the driver.  *Id.* The Court concluded that the report was disclosed in time for Wilson to use it.  *Id.* at 68.  Although Wilson did not have the opportunity to cross-examine Capies, Kellibrew, and Carter with the report's substance, he could have called them in his defense case.

29

*Id.*  Finally, Wilson did not make use of the opportunity to question Detective Giannakoulias, who testified in co-defendant Ball's case.[5]  The Court concluded that the late disclosure did not undermine the fairness of the trial.  *Id.*

The District Court found that the police reports identifying other suspects in Doleman's murder could be *Brady* material.  *Wilson*, *supra*, at 65.  The Court acknowledged,

> Wilson could have sought admission of evidence that someone other than Middleton murdered Doleman in an attempt to argue that Wilson could not have had a motive to murder Middleton.  Thus, these police reports could constitute favorable *Brady* evidence . . .

*Id.*  However, the Court reasoned that there was no reasonable probability that the result of the proceeding would have been different had the evidence been disclosed and denied the motion.  *Id.* at 65-66.  This appeal followed.

## SUMMARY OF ARGUMENT

The jury disbelieved the vast majority of the government's evidence of narcotics conspiracy, racketeering conspiracy, murders, and serious assaults.  Wilson was the only defendant convicted of murder–that of Ronnie Middleton and Sabrina Bradley.  Yet evidence of Wilson's involvement in those murders was extremely thin.  No eye witness put Wilson at the scene of the shooting.  No physical evidence connected him to the crime.  Instead, the government relied on witnesses who

---

[5]  The defense case was conducted by Proctor, who did not recall Carter or question Detective Giannakoulias about Smith's statements.

testified that Wilson made statements implicating himself. But the credibility of each of those witnesses was thoroughly impeached. The jury initially deadlocked on the Middleton/Bradley murder counts, only voting to convict after the District Court changed the verdict form to specify Wilson's role as an aider and abettor.

Several serious errors plagued Wilson's trial. First, the District Court forced Wilson to proceed after lead counsel fell ill in the middle of trial. Second chair counsel, who was appointed after trial started, protested that he was not prepared to take over the defense. Nevertheless, the District Court forced Wilson to proceed and appointed another lawyer to assist. Under the circumstances, no competent counsel could have rendered effective assistance.

Second, the District Court erred in admitting evidence of two uncharged murders. One murder was admitted as intrinsic to the conspiracy. This was error because, although the shooting involved an attempted robbery of another drug dealer, the government failed to show it was connected to the charged conspiracy. The District Court admitted evidence of a second murder under Fed. R. Evid. 404(b) to show Wilson's access to and familiarity with guns. But the probative value of the evidence for that purpose was minuscule because there was ample other evidence of this fact. Both murders were extremely prejudicial to Wilson.

Third, the government withheld *Brady* information. The government alleged that Middleton killed Maurice Doleman and that Wilson, wanting to avenge

Doleman's death, drove Antonio Roberson and Antoine Draine to and from the place where they shot and killed Middleton and Bradley.  In the middle of trial, the government revealed a police interview report identifying Aman  Ball and Joseph Jones (not Roberson and Draine) as the shooters.  Because of the late disclosure, Wilson lost the opportunity to cross-examine key witnesses and investigate alternative suspects.  Next, after trial, the defense obtained additional police interview reports identifying suspects other than Middleton as Doleman's killer.  Wilson could have used evidence of alternative suspects in the Doleman murder to contradict the government's theory of Wilson's motive to kill Middleton.

## ARGUMENT

### SUBSTITUTION OF COUNSEL FOUR MONTHS INTO THE TRIAL DEPRIVED WILSON OF HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION

#### *Legal principles and standard of review*

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." It is beyond dispute that "[a]n accused's right to be represented by counsel is a fundamental component of our criminal justice system."  *United States v. Cronic*, 466 U.S. 648, 653-54 (1984).  The Supreme Court has recognized that, "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the

most pervasive for it affects his ability to assert any other rights he may have." *Id.* (citation omitted). Furthermore, "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

This Court reviews most claims of ineffective assistance of counsel under *Strickland*, *supra*, which requires a showing that (1) counsel's performance was deficient and, (2) the deficient performance prejudiced the defense. *Id.* at 687. But not all cases must satisfy *Strickland*'s two-prong requirement. "There are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* In *Cronic*, the Supreme Court enumerated three circumstances in which prejudice is presumed: (1) there is a complete denial of counsel at a critical stage in the proceedings; (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) circumstances in which the likelihood that even competent counsel can provide effective assistance are so small that a presumption of prejudice is appropriate. *Id.* at 659-60. In those cases, the adversary process itself is presumptively unreliable.

*Cronic's* so-called structural defects "defy analysis by harmless-error standards because they affect the framework within which the trial proceeds and are not simply an error in the trial process itself." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (internal quotations and citations omitted). Difficulty in assessing

prejudice is common to structural error cases. *See e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (reaffirming that prejudice is presumed where an actual conflict of interest affects counsel's performance); *United States v. Taylor*, 139 F.3d 924 (D.C. Cir. 1998) (same); *Mudd v. United States*, 798 F.2d 1509 (D.C. Cir. 1986) (presuming prejudice when defendant was prohibited from discussing his testimony with counsel during a weekend recess).

### *Forcing Wilson to proceed with counsel who was absent for one-third of trial was structural error*

This case is squarely within the presumed prejudice framework of *Cronic*, *supra*, at 659-60, because "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." No replacement counsel could have competently taken over Wilson's case mid-trial. Throughout a trial, counsel must make strategic decisions based on an evaluation of what the prosecution has presented and how it was received by the jury. Counsel's evaluation of each piece of evidence is critical to forming the defense case–what to challenge; what is better left unchallenged; which witnesses to impeach and how; what points are necessary to get across in the defense case; and what evidence available to the defense best counters particular pieces of the government's evidence. This can be done only by critically observing witnesses as they testify and critically observing

34

how the jury received the evidence. Such information cannot be gleaned from the transcript.

Here, four months of the government's case had been litigated. Proctor was absent for one-third of the trial and, when he was present, never expected he would have to take over the defense. Davies had no prior dealings with the case before he was appointed to replace Wicks. Wicks alone possessed the knowledge to mount an effective defense.

As an example of a situation where untimely appointment of counsel would be presumptively prejudicial, the *Cronic* Court cited *Powell v. Alabama*, 287 U.S. 45 (1932), a case decided under the Fifth Amendment due process clause. *Cronic*, *supra*, at 659-60. In *Powell*, the defendants were charged with raping two women. Six days before trial, the judge appointed "all the members of the bar" to represent the defendants at arraignment, anticipating that they would continue to represent the defendants if no counsel was retained. *Id.* at 49. The *Powell* Court held that failure to make an effective appointment of counsel violated the defendant's right to due process. *Id.* at 71. "[S]uch designation of counsel as was attempted here was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard." *Id.* at 53.

The Supreme Court has found structural error in other cases where prejudice was difficult to assess. "[C]onsequences that are necessarily unquantifiable and

35

indeterminate, unquestionably qualifies as 'structural error." *Gonzalez-Lopez*, *supra* at 150 (citations and quotations omitted).  The Court reiterated that the difficulty of assessing the error was a critical factor.  "[W]e rest our conclusion of structural error upon the difficulty of assessing the effect of the error."  *Id.* at 149 n.4.

Other Circuits have found structural error where counsel was unable to exercise judgment in the client's defense.  In *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001), the Court found structural error where counsel slept through portions of the trial.  "The unconscious attorney is in fact no different from an attorney that is physically absent from trial since both are equally unable to exercise judgment on behalf of their clients."  *Id.* at 349.  Here, Proctor could not exercise informed judgment in defending Wilson because he had missed one-third of the trial.  The same can be said for Davies, who missed nearly all of the government's case.  *See Tippins v. Walker*, 77 F.3d 682, 685 (2d Cir. 1996) (applying presumed prejudice because sleeping counsel "suggest a breakdown in the adversarial process") (citation omitted).

In *United States v. Javor*, 724 F.2d 831 (9th Cir. 1984), the Court found structural error because, in the case of sleeping counsel, the client is deprived informed guidance during the course of the trial. *Id.* at 834.  "Generally an attorney and client need to confer about the testimony or evidence adduced at trial and together evaluate its impact."  *Id.*  Prejudice may be presumed when counsel is partially absent. *See  Mitchell v. Mason*, 325 F.3d 732, 742 (6th Cir. 2003), (holding

that where counsel consulted defendant for only six minutes and was suspended from law practice for 30 days just before trial, the defendant was denied counsel and *Cronic*'s presumed prejudice standard applied).  *Id.* at 742.

The *Cronic* Court stated, "*Powell* was [] a case in which the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial."  *Cronic*, *supra*, at 661.  The same is true here.

### *Proctor could not effectively represent Wilson*

The indictment charged Wilson in 22 counts, including narcotics conspiracy, racketeering conspiracy, three homicides, several assaults, violent racketeering offenses, and numerous narcotics distributions for which he faced life imprisonment if convicted.  The lawyers appointed initially to represent him, Katkish and Wicks, had spent two years preparing for what was expected to be a nine-month trial.  In that time, two counsel fully shared the duties of investigating and preparing for trial.

Proctor's introduction to the case came 11 days before trial, and he agreed to replace Katkish only on condition that he would assume a limited role in Wilson's defense.  He had participated in only one federal criminal trial as second-chair.  The District Court's refusal to continue the trial forced Wicks to assume responsibility for many tasks previously performed by Katkish.

37

Proctor could not hope to duplicate Katkish's work, and he didn't try.  That Wicks alone was in command of Wilson's case cannot be seriously disputed.  Proctor, after four months of performing primarily support functions, had no basis on which to evaluate the government's evidence and still had little knowledge of the defense case.  For example, in arguing for a severance, Proctor stated:

> [government counsel] mentioned a few witnesses served by me outside the courtroom.  That's correct.  I did.  In all candor, I don't know why I served them.  I don't know who wants to call them.  I don't know what they're relevant for.  I don't know what statements they gave, what was beyond the scope.  Ms. Wicks said, "Can you go serve these people when they get off the stand?"  I said, "Sure."  So that's not an example of my effectiveness and understanding of the case.  It's an example of my very much ancillary and subservient role to Ms. Wicks in this case thus far.

Tr. 6/25/07AM, 16548.  Although Proctor could read transcripts of the approximately one-third of trial days he missed, he had not read them with the expectation that he might have to take over for Wicks.  "I was reading for informational purposes rather than I would have to weave them into a closing argument because Ms. Wicks was supposed to deliver the closing argument."  Tr. 6/25/07AM, 16552.

In *Powell*, the Court found significant that the judge's appointment of all members of the bar to represent the defendants was too indefinite to convey the requisite sense of responsibility to mount an adequate defense.

> [T]hey would not, thus collectively named, have been given that clear appreciation of responsibility or impressed with that individual sense of

duty which should and naturally would accompany a selected member
of the bar, specifically named and assigned.

*Id.* at 56.    Similarly, the *Powell* Court found significant that the indefinite

appointment deprived the defendants of assistance of counsel during critical pre-trial

preparations.

> [F]rom the time of their arraignment until the beginning of their trial,
> when consultation, thoroughgoing investigation and preparation were
> vitally important, the defendants did not have the aid of counsel in any
> real sense, although they were as much entitled to such aid during that
> period as the trial itself.

*Id.* at 59-50.  In this case, Wilson had counsel continuously but the substitutions

denied him effective assistance of counsel.   Although Wicks and Katkish had

prepared for trial, Proctor had little knowledge of their investigation and research, and

could not use the fruits of their labor to Wilson's benefit any more than all members

of the bar could provide Powell with an adequate defense.

The Sixth Amendment right to counsel is not satisfied, any more than it was in

*Powell*,  when  one  counsel  reviews  the  discovery  and  defends  against  the

government's case-in-chief, followed by a different counsel who conducts the defense

case.   The  lawyer  who  reviews  the  discovery  must  be  the  lawyer  who  tries  the

case–all of the case.

Wilson finished his trial with two lawyers who were appointed after the trial

started.  Proctor, who had never first-chaired a federal trial and who had missed one-

third of the government's case, could not provide assistance within the meaning of the Sixth Amendment. Certainly, he was unprepared to take over a case of this magnitude. The consequence of substituting Wicks with Davies is "unquantifiable and indeterminate," *Gonzalez-Lopez*, *supra*, at 150, and affected the framework in which the trial proceeded. *Id.* at 148. Wicks, who had the opportunity to review the discovery for two years prior to trial and sat through all of the government's case, was the only one who could conduct a meaningful defense. The District Court erred in rescinding its order to server Wilson's case. Wilson was denied his Fifth Amendment right to due process and Sixth Amendment right to effective assistance of counsel. Accordingly, Wilson's convictions and sentences must be reversed and the case remanded for a new trial.

## THE DISTRICT COURT ABUSED ITS DISCRETION IN ADMITTING EVIDENCE OF TWO UNCHARGED MURDERS

### *Standard of review*

A district court's decision to admit evidence of crimes not charged in the indictment is reviewed for abuse of discretion. *See United States v. Long*, 328 F.3d 655, 660 (D.C. Cir. 2003); *United States v. Juan Bowie*, 232 F.3d 923, 926-27 (D.C. Cir. 2000). A District Court's determination pursuant to Fed. R. Evid. 403, that the evidence's probative value substantially outweighs the danger of unfair prejudice, is

reviewed for abuse of discretion.  *See United States v. Becton*, 601 F.3d 588, 595 (D.C. Cir. 2010).

### *Legal principles*

"It is fundamental to American jurisprudence that 'a defendant must be tried for what he did, not for who he is.'" *United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980) (quoting *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977)). Fed. R. Evid. 404(b) prohibits the use of other crimes or wrongs to prove that the defendant has the propensity to commit crimes.  Rule 404(b) states:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> . . .
> This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Rule 404(b) provides that upon request, the prosecutor must give reasonable notice of the general nature of the other acts evidence.

The Advisory Committee notes to Rule 404(b) state that if the evidence is offered for a permissible purpose, "[t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for make decision of this kind under Rule 403."  The rule recognizes the "inherently damaging nature of bad acts evidence."  *Foskey*, *supra*, at 523.

41

Fed. R. Evid. 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one of more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Rule 403 requires the district court to engage in "on-the-spot balancing of probative value and prejudice" and to exclude even factually relevant evidence when it fails the balancing test. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (internal quotations and citations omitted).

But Rule 404(b) excludes only evidence that is "extrinsic" to charged crimes, not evidence "intrinsic" to or "inextricably intertwined" with the charged offenses. *See United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992). "'Intrinsic' evidence encompasses evidence that is either 'of an act that is part of the charged offense' or is of 'acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'" *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (quoting *Bowie (Juan)*, *supra*, at 929).

At the same time, this Court has criticized the distinction between intrinsic and extrinsic evidence. "Given the practical and definitional problems that plague the extrinsic-intrinsic distinction, we have called into question the need for such a distinction" *United States v. Alexander*, 331 F.3d 116, 125 n.13 (D.C. Cir. 2003).

Rather, "[i]f the so-called 'intrinsic' act is indeed part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b)." *Bowie (Juan)*, *supra*, at 927.

Nonetheless, this Court has acknowledged that, "at least in a narrow range of circumstances . . . evidence can be 'intrinsic to' the charged crime." *Bowie (Juan)*, *supra*, 232 F.3d at 929. Intrinsic evidence is still subject to the requirements of Fed. R. Evid. 401, regarding relevance, and Fed. R. Evid. 403, balancing the probative value of the evidence against unfair prejudice, among other factors. *See United States v. Becton*, 601 F.3d 588, 595 (D.C. Cir. 2010).

Defining "inextricably entwined" is also problematic. This Court has rejected as over-broad, the definition adopted in some other circuits, that evidence is inextricably interwined if it completes the story of the charged offense. *See Bowie (Juan)*, *supra*, at 928 ("[t]he fact that omitting some evidence would render a story slightly less complete cannot justify circumventing Rule 404(b) altogether"). Evidence that is "inextricably intertwined" with the charged crime is typically treated as the same crime. *Id.*, at 927.

### *The Reid and Phillips murders should not have been admitted*

The District Court's ruling that the Reid murder was intrinsic to the conspiracy was error because the government failed to show its connection to the charged conspiracy. The Phillips murder was ostensibly admitted to show Wilson's access to and familiarity with guns. The prejudice from admitting this brazen daytime murder

43

far outweighed its relevancy because there was overwhelming undisputed evidence of Wilson's use of guns.  The error was compounded because the District Court applied an incorrect standard to weigh whether or not to admit the evidence.

### The Reid murder was outside the "narrow range of circumstances" where intrinsic evidence may be used

Evidence is intrinsic if it is part of the charged offense, or it is an act that is contemporaneous with the charged crime–if it facilitates the charged crime.  *See Moore*, *supra*, at 63; *Bowie (Juan)*, *supra*, at 929.  *Bowie* illustrates the careful analysis courts must apply before admitting evidence as intrinsic to the charged crime.  Bowie was prosecuted for possessing counterfeit currency seized on May 16, 1997.  The government sought to introduce evidence that a month earlier, on April 17, he was arrested with counterfeit bills that were identical–with matching serial numbers–to the ones seized on May 16.  *Id.* at 926.  The District Court held that because the bills seized in April tallied with those seized May, they were evidence of the same crime and were "inextricably intertwined."  *Id.* at 927.  This Court disagreed.  "All of the bills . . . were doubtless from the same supplier and possibly the same batch, and the evidence indicated that Bowie purchased them at one time . . . [b]ut it cannot be that all evidence tending to prove the crime is part of the crime."  *Id.* at 929.

44

This Court has upheld admission of evidence as intrinsic if it is direct evidence of the crime charged. *See Alexander*, *supra*, (holding that a witness's statement that defendant had a gun was direct evidence of the charge of being a felon in possession of a gun); *Becton*, *supra* (holding that the defendant's conduct while incarcerated was direct evidence of continued participation in the charged conspiracy); *United States v. Badru*, 97 F.3d 1471 (D.C. Cir. 1996) (holding that in a prosecution for drug conspiracy, evidence showing source of drugs was intrinsic to the charged offense).

In *United States v. Murray*, 103 F.3d 310 (3d Cir. 1997), the Court of Appeals for the Third Circuit held that the District Court abused its discretion in admitting an uncharged murder in a prosecution for murder and drug offenses in furtherance of a continuing criminal enterprise (CCE). While the government argued that a prior murder was relevant to show the defendant's role as the "shooter" in the organization, it failed to show that the prior murder was connected to the charged CCE. *Id.* at 317. The Court of Appeals held that under the highly deferential abuse of discretion standard of review, the District Court erred. *Id.* at 317. Even if the evidence was relevant to something other than character, "this relevance was so light and the potential for unfair prejudice was so great that Fed. R. Evid. 403 demanded the exclusion of the evidence." *Id.* at 317-18.

Here, the government argued that the evidence was intrinsic because Wilson murdered Reid to enrich members of the organization, to weaken another drug dealer,

45

and the evidence showed the relationship between members of the alleged conspiracy. (Dkt. 579 p. 4).  Absent speculation, the Reid murder showed nothing of the sort. Rather, it showed an uncharged attempted robbery gone bad.  To be sure, participants in the robbery allegedly were members of the charged conspiracy, but more is required.  *See United States v. Lighty*, 616 F.3d 321, 353-54 (4th Cir. 2010) (rejecting uncharged murder as intrinsic evidence where "the events occurred at different times, at different places, and involved completely different motives).

According to the government's evidence, after the killing, Wilson and Capies attempted to get Connor to pay them to murder L.A.  They were not interested in harming Connor or diminishing his stature.  Capies claimed he, Wilson, and Thurston wanted drugs and money for themselves and were not trying to benefit any larger conspiracy.

The government's broad characterization of the murder as furthering the charged conspiracy did not fit into the "narrow range of circumstances" permitting admission of intrinsic evidence, *Bowie (Juan)*, *supra*, at 929.  Although the homicide occurred contemporaneously with the charged conspiracy, the government's evidence did not establish a direct link between it and the narcotics crimes for which Wilson was on trial.  The District Court's failure to conduct a careful analysis before ruling it was intrinsic evidence was an abuse of discretion.

46

***Admission of the Philips murder to show familiarity with and access to guns
was an abuse of discretion***

The District Court held that the Phillips murder was admissible under Rule 404(b) to show Wilson's access to and familiarity with guns. Tr. 1/22/07, 96-98. The Court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *Id.* But the Court failed to consider the other evidence that was more than ample to show Wilson's access to and familiarity with guns. When determining admissibility of other crimes evidence, judges must conduct the balancing test "in view of the availability of other means of proof . . . " Rule 404(b) Advisory Committee Notes. The Supreme Court has recognized that, "the probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point." *Old Chief v. United States*, 519 U.S. 172 (1997) (citation omitted).

The probative value of the Phillips murder to show Wilson's access to and familiarity with guns was severely diminished by the government's evidence that Wilson had used guns on many other occasions. According to the government, the gun violence in Congress Park was rampant, with frequent robberies, shootings, and murders. The evidence directly related to the charged offenses against Wilson alone was more than ample to show that his access to and familiarity with guns; added to

47

that was all the evidence of gun violence committed by Wilson's co-defendants, and evidence that they shared guns with each other. A brief summary follows:

Capies said Wilson gave him a gun when he (Capies) was released around 1999, Tr. 4/2/07AM, 5217-19, and that they used each other's guns. Tr. 4/2/07AM, 5217. According to Capies, "the way we was living, you need a gun . . . You out there hustling, selling drugs and you done did stuff to people and stuff like that, you going to have a gun" Tr. 4/2/07AM, 5218. He testified that Wilson carried a gun, Tr. 3/29/07PM, 5005, and kept an "AK" under the mattress in his bedroom Tr. 4/3/07AM, 5462-63. Capies claimed that he and Wilson put their guns on a stool in Wilson's apartment, shortly before Ball assaulted them. Tr. 4/3/07AM, 5457-58.

Kairi Kellibrew testified that Wilson had a gun when Kellibrew was fighting with Little Rob. Tr. 5/8/07PM, 10541-42. Robert Pough told jurors Wilson committed a robbery with a gun in 1995. Tr. 5/17/08AM, 11675-77. James Faison said Wilson shot at him around 1994-95. Tr. 5/29/07AM, 13108-09. According to Damien Green, Wilson, armed with a gun, took Green's sweatshirt in 1993, Tr. 5/31/07PM, 13786-89, and he saw Wilson with a gun during the summer of 1996. Tr. 5/31/07PM, 13820. Green claimed to have seen a gun sticking out of Wilson's pocket, Tr. 5/31/07PM, 13826, and in 1996 Wilson and Tweety opened fire outside a recreation center. Tr. 5/31/07PM, 13830-31 in 1996.

48

Cedric Conner testified that around 1993 to 1995, he heard a gunshot that came from the direction where Wilson and two others were standing. Tr. 4/23/07PM, 8137. Darlene Irving said she saw Wilson shoot someone. Tr. 3/28/07AM, 4690-94.

In light of this plethora of other evidence, the Phillips murder was unnecessary to show Wilson's familiarity with and access to guns. This Court has acknowledged the importance of considering other means of proof. *See Carter v. District of Columbia*, 795 F.2d 116, 132 (D.C. Cir. 1986) (holding that the District Court abused its discretion by failing to take into account the availability of other means of proof); *United States v. Brown*, 597 F.3d 399, 406 (D.C. Cir. 2010) (noting that availability of alternatives is a factor); *Foskey*, *supra* (holding that evidence should have been excluded because the minimal relevance was substantially outweighed by the danger of unfair prejudice).

In *Lighty*, *supra*, the Fourth Circuit held that the District Court abused its discretion in admitting an uncharged murder in a prosecution for kidnaping and murder. After ruling that the evidence was not intrinsic, the Court rejected the government's argument that it was admissible Rule 404(b) evidence to show that the defendant was found in possession of a gun that was consistent with the murder weapon in the charged offense. *Id.* at 354. The Court said Rule 404(b) evidence may not be necessary if it is cumulative. "Moreover, as the quantum of other non-Rule 404(b) evidence available to prove an issue unrelated to character increases, the need

49

for the Rule 404(b) evidence decreases." *Id.* The Court held it was error to admit the uncharged murder because of other evidence establishing the same fact.

Here, the District Court's error was compounded by using an incorrect balancing standard. The Rule 404(b) Advisory Committee Notes state that the Court must balance "whether the danger of undue prejudice outweighs the probative value of the evidence in light of other means of proof . . . " But the District Court used the higher standard in Rule 403, allowing exclusion if the probative value is *substantially* outweighed by unfair prejudice."

With the ample evidence that Wilson carried a gun and was involved in other shootings, the notion that the Phillips murder was necessary to show Wilson's familiarity with and access to guns stretches credulity. It was nothing short of propensity evidence. The Supreme Court has cautioned, "[a]lthough propensity evidence is relevant, the risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment–creates a prejudicial effect that outweighs ordinary relevance" *Old Chief*, *supra*, at 181 (internal citations and quotations omitted).

The Phillips murder–in which Brown claimed to have watched Wilson nonchalantly shoot another man dead–was extremely prejudicial. The government argued it needed to show Wilson's access to and familiarity with guns. But admitting an entire murder to prove such a small undisputed fact was an abuse of discretion.

### THE GOVERNMENT'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE MATERIAL TO THE MIDDLETON/BRADLEY MURDERS VIOLATED WILSON'S RIGHT TO DUE PROCESS

#### *Standard of review*

Whether the government has breached its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), is a question of law reviewed *de novo*. *See In re Sealed Case*, 185 F.3d 887, 892 (D.C. Cir. 1999). Specifically, the assessment of whether evidence is material under *Brady* is reviewed *de novo*. *See United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010).

#### *Legal principles*

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87. Later, the Court recognized that the prosecution had a duty to disclose favorable evidence even without a defense request. *See United States v. Agurs*, 427 U.S. 97 (1976). The state's duty to disclose exculpatory evidence is to ensure that a defendant receives a fair trial. *Brady*, *supra*, at 83 ("[s]ociety wins not only when the guilty are convicted but when criminal trials are fair"). *See also United States v. Bagley*, 473 U.S. 667, 675 (1985) (stating that the *Brady* rule is "based on requirement of due process . . . [T]he prosecutor is . . . to

disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial").

Three elements must be satisfied to prevail on a *Brady* claim:

(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.

*Strickler v. Green*, 527 U.S. 263, 280-82 (1999); *Pettiford*, *supra*, at 1227.

Favorable evidence includes evidence affecting a witness's credibility. *See United States v. Walter Bowie*, 198 F.3d 905, 908 (D.C. Cir. 1999) (stating that "[e]vidence affecting the credibility of government witnesses is a category of exculpatory information potentially within *Brady*, disclosure obligation") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (stating that the prosecutor has the same duty to disclose impeachment as exculpatory evidence).

Evidence is "suppressed" even if withheld unintentionally. "[A]n inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. 'If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.'" *Strickler*, *supra*, at 288 (quoting *Agurs*, *supra*, at 110). Accordingly, the prosecutor is responsible for disclosing *Brady* information in police files. *See In re Sealed Case*,

*supra*, at 896 (stating that, "prosecutors in this District are responsible for disclosing Brady information contained in MPD files, 'given the close working relationship between the Washington Metropolitan police and the U.S. Attorney'").

The prosecution must disclose the evidence in a timely manner, "to allow the defense to use the favorable material effectively in the preparation and presentation of its case . . . " *United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2009) (quoting *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976)).

Evidence is material, requiring a new trial, if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, *supra*, at 682). The Supreme Court has explained that the test is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence" in its outcome. *Kyles*, *supra*, at 435; *Strickler*, *supra*, at 290. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Kyles*, *supra*, at 434. This Court has held, "to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Bowie (Walter)*, *supra*, at 909.

When there are multiple nondisclosures, this Court must consider the cumulative effect of the nondisclosures. "The effect of each nondisclosure must not only be considered alone, but the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently material to justify a new trial." *United States v. Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995) (quotations and citation omitted).

### *The District Court erroneously held that the Carter report was disclosed in time for Wilson to use it*

The District Court found that Wilson was not disadvantaged by the government's late disclosure of the Carter report. The Court noted that it was a mere two-page report; it was disclosed two months before the end of the government's case; and Wilson could have called in his case any witnesses he wanted to question about the report. *Wilson, supra*, at 68. The Court erred.

The government had presented unchallenged evidence that Roberson and Draine shot Middleton and Bradley. In the middle of trial, the defense learned of evidence that Smith, the only eyewitness to the shooting, had said Aman Ball and Joseph Jones were the shooters. Although the government's theory was that Wilson was the driver rather than one of the shooters, evidence of different shooters would have undermined the foundation of the government's case. It also contradicted

54

Capies and Kelliebrew, who both claimed that Wilson said Roberson and Draine committed the murders.

That Wilson could have called Carter, Capies, and Kelliebrew in his case is beside the point. As discussed previously, Proctor, despite his protests that he was unprepared, was forced to lead Wilson's defense. He did not call any witnesses in the defense case to testify about Smith's statement. Wicks was not allowed to cross-examine Johnson about Aman Ball and Jones as suspects.

Moreover, the "focus is on the potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case." *Cuffie*, *supra*, 80 F.3d at 517 (internal citations and quotations omitted). As this Court recognized, "we must look not to the ways defense counsel was able to impeach . . . [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996). Here, the government's evidence that Roberson and Draine were the shooters was allowed to stand unchallenged.

### *The District Court erroneously concluded that undisclosed reports naming other suspects as Doleman's killer were not material*

The District Court acknowledged that the defense could have introduced evidence that someone other than Middleton killed Doleman to counter the government's motive theory. In concluding that the police reports were not material,

the Court reasoned that evidence of other suspects in the Doleman killing "was collateral to whether Wilson believed that Middleton killed Doleman." *Wilson*, *supra*, at 65. The Court held that "[t]he police reports do not directly exonerate Wilson or lessen the force of the corroborated and credible testimony regarding admissions Wilson made about his involvement in these murders to others like Kellibrew, Scott, and Cottingham. The Court found Cottingham's testimony "particularly compelling given her relationship with Wilson and . . . unlike the other three witnesses, was not testifying under any deal." *Id.* at 65 n. 6.

A cornerstone of the government's theory was that Wilson wanted to kill Middleton to avenge Doleman's death. To be sure, the government's motive theory rested upon who Wilson believed killed Doleman regardless of who actually killed Doleman. But the government's evidence of what Wilson believed was extremely slight. Capies testified that Wilson talked about killing Middleton in retaliation for Doleman's murder, Tr. 3/29/07PM, 5095-96, but Capies' credibility was thoroughly impeached. The government made up for the paucity of evidence by presenting instead, evidence that Wilson was close to Doleman and that Middleton in fact killed Doleman. In its opening statement, the government told the jury:

> Ronnie Middleton, Squid, worked for Edelin and he went out in November of 1993 and he killed Reesey. . . .

56

> The person who took it most personally and was most upset about it was David Wilson. Why? Well, David Wilson actually was extremely close to Reesey. . . .
>
> [ ] finally in August of 1998, David Wilson, the man who considered Reesey like a brother, finally got his revenge on Squid, the man who killed him. . . . David Wilson finally got his revenge on the man who killed Reesey.

Tr. 2/21/07AM, 71-72, 74-75.

Wilson's motive to avenge Doleman was again featured in the government's closing argument.

> You heard about how they then drive back up . . . and retaliate in order to do what David Wilson has been trying to do since 1993; Get Ronnie Middleton, retaliate.

Tr. 10/3/07 PM, 22730. Yet there was little evidence that Wilson actually thought Middleton killed Doleman. There was no need, as long as Middleton was the undisputed killer. The jury could infer that Wilson believed, along with everyone else, that it was Middleton.

The undisclosed reports–showing there were at least three other suspects– that Ball, the alleged leader of the conspiracy, believed Maurice Willis was Doleman's killer; that word on the street was that Calvin Smith was the killer; that Johnson said he saw someone else shoot Doleman–all would have undermined the government's theory that Wilson targeted Middleton in revenge. At a minimum, the reports showed it was far from clear who killed Doleman. This uncertainty was never suggested to

57

the jury–which heard uncontradicted evidence that Middleton killed Doleman. The undisclosed police reports "could reasonably be taken to put the whole case in such a different light as to undermine confidence [in its outcome]." *Kyles*, *supra*, at 435; *Strickler*, *supra*, at 290.

The District Court also erred in giving so much weight to Cottingham's testimony. True, she was the only witness who did not testify under a cooperation agreement. But she had the most personal reason to testify falsely–she believed Wilson was involved in her brother's death. Cottingham, attempting to hide her bias, at first denied, but then admitted, that she believed Wilson was involved in her brother's death. Tr. 6/13/07PM, 15409-10. The District Court misjudged both the importance of the *Brady* material and the weakness of the government's case.

### Cumulative effect of the nondisclosures

Taken together, the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, *supra*, 514 U.S. at 435. The Supreme Court has emphasized that *Brady*'s materiality standard is a "reasonable probability" of a different result:

> [T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Strickler*, *supra*, 527 U.S. at 280 (internal citations omitted); *see also Lloyd*, *supra*, 71 F.3d at 411.

In this case, evidence of Wilson's involvement in the murders was weak. There was no eyewitness and no physical evidence linking Wilson to the crimes. Instead, the government presented witnesses who testified that Wilson made statements implicating himself. But every one of those witnesses was thoroughly impeached.

In *Cuffie*, this Court held that "[e]vidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict." *Id.* at 517 (internal citations and quotations omitted). The undisclosed evidence would have put the government's case in a different light because it identified different shooters in the Middleton/Bradley murders and contradicted the government's motive theory. It also impeached Capies, Kellibrew, Scott, and Carter. The jury initially deadlocked on the murder counts. Certainly, there was a reasonable probability of a different result had the government properly disclosed the evidence. Wilson is entitled to a new trial.

## CONCLUSION

For the foregoing reasons, Mr. Wilson requests that this Court reverse his convictions and sentences and remand his case to the District Court.

## REQUEST FOR ORAL ARGUMENT

Wilson respectfully requests that this Court hear oral argument in this case.

Respectfully Submitted,

/s/ Sicilia C. Englert
Michael E. Lawlor
Sicilia C. Englert
Lawlor & Englert, LLC
6305 Ivy Lane, Suite 608
Greenbelt, MD 20770
301.474.3404

Appointed Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,842*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel WordPerfect 12*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: September 16, 2013          /s/ Sicilia C. Englert
                                   *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 16th day of September, 2013, I caused this Page Proof Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Elizabeth H. Danello
> Stratton C. Strand
> U.S. ATTORNEY'S OFFICE
> (USA) Appellate Division
> 555 4th Street, NW, Room 8104
> Washington, DC  20530
> (202) 514-7088
>
> *Counsel for Appellee*

I further certify that on the 17th day of September, 2013, I caused the required copies of the Page Proof Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Sicilia C. Englert
*Counsel for Appellant*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page**

U.S. CONST. amend. IV ................................................................Add. 1

U.S. CONST. amend. V ................................................................Add. 2

Fed. R. Evid. 401 ......................................................................Add. 3

Fed. R. Evid. 403 ......................................................................Add. 5

Fed. R. Evid. 404 ......................................................................Add. 7

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment IV. Searches and Seizures (Refs & Annos)

U.S.C.A. Const. Amend. IV-Search and Seizure

Amendment IV. Search and Seizure

Currentness

<Notes of Decisions for this amendment are displayed in four separate documents. Notes of Decisions for subdivisions I to XI are contained in this document. For Notes of Decisions for subdivisions XII to XXIV, see the second document for Amend. IV-Search and Seizure. For Notes of Decisions for subdivisions XXV to XXXIV see the third document for Amend. IV-Search and Seizure. For Notes of Decisions for subdivisions XXXV to end, see the fourth document for Amend IV-Search and Seizure.>

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Notes of Decisions (4278)

U.S.C.A. Const. Amend. IV-Search and Seizure, USCA CONST Amend. IV-Search and Seizure
Current through P.L. 113-31 approved 8-9-13

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 1

USCA Case #11-3032    Document #1456799    Filed: 09/16/2013    Page 76 of 86

Amendment V. Grand Jury Indictment for Capital Crimes;..., USCA CONST Amend....

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self-Incrimination; Due
      Process of Law; Just Compensation for Property (Refs & Annos)

U.S.C.A. Const. Amend. V-Full Text

AmendmentV. Grand Jury Indictment for Capital Crimes; Double Jeopardy;
Self-Incrimination; Due Process of Law; Just Compensation for Property

Currentness

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

    <This amendment is further displayed in five separate documents according to subject matter,>

    <see USCA Const Amend. V-Capital Crimes>

    <see USCA Const Amend. V-Double Jeopardy>

    <see USCA Const Amend. V-Self Incrimination>

    <see USCA Const Amend. V-Due Process>

    <see USCA Const Amend. V-Just Compensation>

U.S.C.A. Const. Amend. V-Full Text, USCA CONST Amend. V-Full Text
Current through P.L. 113-31 approved 8-9-13

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 2

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits

Federal Rules of Evidence Rule 401, 28 U.S.C.A.

Rule 401. Test for Relevant Evidence

Currentness

Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

**(b)** the fact is of consequence in determining the action.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1931; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

Problems of relevancy call for an answer to the question whether an item of evidence, when tested by the processes of legal reasoning, possesses sufficient probative value to justify receiving it in evidence. Thus, assessment of the probative value of evidence that a person purchased a revolver shortly prior to a fatal shooting with which he is charged is a matter of analysis and reasoning.

The variety of relevancy problems is coextensive with the ingenuity of counsel in using circumstantial evidence as a means of proof. An enormous number of cases fall in no set pattern, and this rule is designed as a guide for handling them. On the other hand, some situations recur with sufficient frequency to create patterns susceptible of treatment by specific rules. Rule 404 and those following it are of that variety; they also serve as illustrations of the application of the present rule as limited by the exclusionary principles of Rule 403.

Passing mention should be made of so-called "conditional" relevancy. Morgan, Basic Problems of Evidence 45-46 (1962). In this situation, probative value depends not only upon satisfying the basic requirement of relevancy as described above but also upon the existence of some matter of fact. For example, if evidence of a spoken statement is relied upon to prove notice, probative value is lacking unless the person sought to be charged heard the statement. The problem is one of fact, and the only rules needed are for the purpose of determining the respective functions of judge and jury. See Rules 104(b) and 901. The discussion which follows in the present note is concerned with relevancy generally, not with any particular problem of conditional relevancy.

Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand. James, Relevancy, Probability and the Law, 29 Calif.L.Rev. 689, 696, n. 15 (1941), in Selected Writings on Evidence and Trial 610, 615, n. 15 (Fryer ed. 1957). The rule summarizes this relationship as a "tendency to make the existence" of the fact to be proved

Add. 3

"more probable or less probable." Compare Uniform Rule 1(2) which states the crux of relevancy as "a tendency in reason," thus perhaps emphasizing unduly the logical process and ignoring the need to draw upon experience or science to validate the general principle upon which relevancy in a particular situation depends.

The standard of probability under the rule is "more * * * probable than it would be without the evidence." Any more stringent requirement is unworkable and unrealistic. As McCormick § 152, p. 317, says, "A brick is not a wall," or, as Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 576 (1956), quotes Professor McBaine, " * * * [I]t is not to be supposed that every witness can make a home run." Dealing with probability in the language of the rule has the added virtue of avoiding confusion between questions of admissibility and questions of the sufficiency of the evidence.

The rule uses the phrase "fact that is of consequence to the determination of the action" to describe the kind of fact to which proof may properly be directed. The language is that of California Evidence Code § 210; it has the advantage of avoiding the loosely used and ambiguous word "material." Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence (Art. I. General Provisions), Cal.Law Revision Comm'n, Rep., Rec. & Studies, 10-11 (1964). The fact to be proved may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action. Cf. Uniform Rule 1(2) which requires that the evidence relate to a "material" fact.

The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of such considerations as waste of time and undue prejudice (see Rule 403), rather than under any general requirement that evidence is admissible only if directed to matters in dispute. Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of real estate, murder weapons, and many other items of evidence fall in this category. A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission. Cf. California Evidence Code § 210, defining relevant evidence in terms of tendency to prove a disputed fact.

**2011 Amendments**

The language of Rule 401 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (353)

Fed. Rules Evid. Rule 401, 28 U.S.C.A., FRE Rule 401
Amendments received to 7-15-13

---

**End of Document**                                  © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 4

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article IV. Relevance and Its Limits

Federal Rules of Evidence Rule 403, 28 U.S.C.A.

Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

Currentness

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**CREDIT(S)**

   (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1932; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission. Slough, Relevancy Unraveled, 5 Kan.L.Rev. 1, 12-15 (1956); Trautman, Logical or Legal Relevancy--A Conflict in Theory, 5 Van.L.Rev. 385, 392 (1952); McCormick § 152, pp. 319-321. The rules which follow in this Article are concrete applications evolved for particular situations. However, they reflect the policies underlying the present rule, which is designed as a guide for the handling of situations for which no specific rules have been formulated.

Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities. "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

The rule does not enumerate surprise as a ground for exclusion, in this respect following Wigmore's view of the common law. 6 Wigmore § 1849. Cf. McCormick § 152, p. 320, n. 29, listing unfair surprise as a ground for exclusion but stating that it is usually "coupled with the danger of prejudice and confusion of issues." While Uniform Rule 45 incorporates surprise as a ground and is followed in Kansas Code of Civil Procedure § 60-445, surprise is not included in California Evidence Code § 352 or New Jersey Rule 4, though both the latter otherwise substantially embody Uniform Rule 45. While it can scarcely be doubted that claims of unfair surprise may still be justified despite procedural requirements of notice and instrumentalities of discovery, the granting of a continuance is a more appropriate remedy than exclusion of the evidence. Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence (Art. VI. Extrinsic Policies Affecting Admissibility), Cal.Law Revision Comm'n, Rep., Rec. & Studies, 612 (1964). Moreover, the impact of a rule excluding evidence on the ground of surprise would be difficult to estimate.

In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction. See Rule 106 [now 105] and Advisory Committee's Note thereunder. The availability of other means of proof may also be an appropriate factor.

Add. 5

**2011 Amendments**

The language of Rule 403 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (2315)

Fed. Rules Evid. Rule 403, 28 U.S.C.A., FRE Rule 403
Amendments received to 7-15-13

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

Add. 6

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits

Federal Rules of Evidence Rule 404, 28 U.S.C.A.

Rule 404. Character Evidence; Crimes or Other Acts

Currentness

**(a) Character Evidence.**

**(1) Prohibited Uses.** Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

**(2) Exceptions for a Defendant or Victim in a Criminal Case.** The following exceptions apply in a criminal case:

**(A)** a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;

**(B)** subject to the limitations in Rule 412, a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted, the prosecutor may:

**(i)** offer evidence to rebut it; and

**(ii)** offer evidence of the defendant's same trait; and

**(C)** in a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

**(3) Exceptions for a Witness.** Evidence of a witness's character may be admitted under Rules 607, 608, and 609.

**(b) Crimes, Wrongs, or Other Acts.**

**(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2) Permitted Uses; Notice in a Criminal Case.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

Add. 7

**(A)** provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

**(B)** do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1932; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

**Note to Subdivision (a).** This subdivision deals with the basic question whether character evidence should be admitted. Once the admissibility of character evidence in some form is established under this rule, reference must then be made to Rule 405, which follows, in order to determine the appropriate method of proof. If the character is that of a witness, see Rules 608 and 610 for methods of proof.

Character questions arise in two fundamentally different ways. (1) Character may itself be an element of a crime, claim, or defense. A situation of this kind is commonly referred to as "character in issue." Illustrations are: the chastity of the victim under a statute specifying her chastity as an element of the crime of seduction, or the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver. No problem of the general relevancy of character evidence is involved, and the present rule therefore has no provision on the subject. The only question relates to allowable methods of proof, as to which see Rule 405, immediately following. (2) Character evidence is susceptible of being used for the purpose of suggesting an inference that the person acted on the occasion in question consistently with his character. This use of character is often described as "circumstantial." Illustrations are: evidence of a violent disposition to prove that the person was the aggressor in an affray, or evidence of honesty in disproof of a charge of theft. This circumstantial use of character evidence raises questions of relevancy as well as questions of allowable methods of proof.

In most jurisdictions today, the circumstantial use of character is rejected but with important exceptions: (1) an accused may introduce pertinent evidence of good character (often misleadingly described as "putting his character in issue"), in which event the prosecution may rebut with evidence of bad character; (2) an accused may introduce pertinent evidence of the character of the victim, as in support of a claim of self-defense to a charge of homicide or consent in a case of rape, and the prosecution may introduce similar evidence in rebuttal of the character evidence, or, in a homicide case, to rebut a claim that deceased was the first aggressor, however proved; and (3) the character of a witness may be gone into as bearing on his credibility. McCormick §§ 155-161. This pattern is incorporated in the rule. While its basis lies more in history and experience than in logic an underlying justification can fairly be found in terms of the relative presence and absence of prejudice in the various situations. Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 584 (1956); McCormick § 157. In any event, the criminal rule is so deeply imbedded in our jurisprudence as to assume almost constitutional proportions and to override doubts of the basic relevancy of the evidence.

The limitation to pertinent traits of character, rather than character generally, in paragraphs (1) and (2) is in accordance with the prevailing view. McCormick § 158, p. 334. A similar provision in Rule 608, to which reference is made in paragraph (3), limits character evidence respecting witnesses to the trait of truthfulness or untruthfulness.

The argument is made that circumstantial use of character ought to be allowed in civil cases to the same extent as in criminal cases, i.e. evidence of good (nonprejudicial) character would be admissible in the first instance, subject to rebuttal by evidence of bad character. Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 581-583 (1956); Tentative

Add. 8

Recommendation and a Study Relating to the Uniform Rules of Evidence (Art. VI. Extrinsic Policies Affecting Admissibility), Cal.Law Revision Comm'n, Rep., Rec. & Studies, 657-658 (1964). Uniform Rule 47 goes farther, in that it assumes that character evidence in general satisfies the conditions of relevancy, except as provided in Uniform Rule 48. The difficulty with expanding the use of character evidence in civil cases is set forth by the California Law Revision Commission in its ultimate rejection of Uniform Rule 47, *id.,* 615:

"Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

Much of the force of the position of those favoring greater use of character evidence in civil cases is dissipated by their support of Uniform Rule 48 which excludes the evidence in negligence cases, where it could be expected to achieve its maximum usefulness. Moreover, expanding concepts of "character," which seem of necessity to extend into such areas as psychiatric evaluation and psychological testing, coupled with expanded admissibility, would open up such vistas of mental examinations as caused the Court concern in *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). It is believed that those espousing change have not met the burden of persuasion.

**Note to Subdivision (b).** Subdivision (b) deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistently with that rule, evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it. However, the evidence may be offered for another purpose, such as proof of motive, opportunity, and so on, which does not fall within the prohibition. In this situation the rule does not require that the evidence be excluded. No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403. Slough and Knightly, Other Vices, Other Crimes, 41 Iowa L.Rev. 325 (1956).

**1974 Enactment**

**Note to Subdivision (b).** The second sentence of Rule 404(b) as submitted to the Congress began with the words "This subdivision does not exclude the evidence when offered." The Committee amended this language to read "It may, however, be admissible", the words used in the 1971 Advisory Committee draft, on the ground that this formulation properly placed greater emphasis on admissibility than did the final Court version. House Report No. 93-650.

**Note to Subdivision (b).** This rule provides that evidence of other crimes, wrongs, or acts is not admissible to prove character but may be admissible for other specified purposes such as proof of motive.

Although your committee sees no necessity in amending the rule itself, it anticipates that the use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e., prejudice, confusion or waste of time. Senate Report No. 93-1277.

**1987 Amendments**

The amendments are technical. No substantive change is intended.

**1991 Amendments**

**Rule 404(b) has emerged as one of the most cited Rules in the Rules of Evidence.** And in many criminal cases evidence of an accused's extrinsic acts is viewed as an important asset in the prosecution's case against an accused. Although there are a

few reported decisions on use of such evidence by the defense, *see, e.g., United States v. McClure,* 546 F.2d 670 (5th Cir.1990) (acts of informant offered in entrapment defense), the overwhelming number of cases involve introduction of that evidence by the prosecution.

The amendment to Rule 404(b) adds a pretrial notice requirement in criminal cases and is intended to reduce surprise and promote early resolution on the issue of admissibility. The notice requirement thus places Rule 404(b) in the mainstream with notice and disclosure provisions in other rules of evidence. *See, e.g.,* Rule 412 (written motion of intent to offer evidence under rule), Rule 609 (written notice of intent to offer conviction older than 10 years), Rule 803(24) and 804(b)(5) (notice of intent to use residual hearsay exceptions).

The Rule expects that counsel for both the defense and the prosecution will submit the necessary request and information in a reasonable and timely fashion. Other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes a reasonable request or disclosure will depend largely on the circumstances of each case. *Compare* Fla.Stat.Ann. § 90.404(2)(b) (notice must be given at least 10 days before trial) *with* Tex.R.Evid. 404(b) (no time limit).

Likewise, no specific form of notice is required. The Committee considered and rejected a requirement that the notice satisfy the particularity requirements normally required of language used in a charging instrument. *Cf.* Fla.Stat.Ann. § 90.404(2)(b) (written disclosure must describe uncharged misconduct with particularity required of an indictment or information). Instead, the Committee opted for a generalized notice provision which requires the prosecution to apprise the defense of the general nature of the evidence of extrinsic acts. The Committee does not intend that the amendment will supercede other rules of admissibility or disclosure, such as the Jencks Act, 18 U.S.C. § 3500, et. seq. nor require the prosecution to disclose directly or indirectly the names and addresses of its witnesses, something it is currently not required to do under Federal Rule of Criminal Procedure 16.

The amendment requires the prosecution to provide notice, regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal. The court in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness. Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met.

Nothing in the amendment precludes the court from requiring the government to provide it with an opportunity to rule *in limine* on 404(b) evidence before it is offered or even mentioned during trial. When ruling *in limine,* the court may require the government to disclose to it the specifics of such evidence which the court must consider in determining admissibility.

The amendment does not extend to evidence of acts which are "intrinsic" to the charged offense, *see United States v. Williams,* 900 F.2d 823 (5th Cir.1990) (noting distinction between 404(b) evidence and intrinsic offense evidence). Nor is the amendment intended to redefine what evidence would otherwise be admissible under Rule 404(b). Finally, the Committee does not intend through the amendment to affect the role of the court and the jury in considering such evidence. *See United States v. Huddleston,* 485 U.S. 681, 108 S.Ct. 1496 (1988).

**2000 Amendments**

Rule 404(a)(1) has been amended to provide that when the accused attacks the character of an alleged victim under subdivision (a)(2) of this Rule, the door is opened to an attack on the same character trait of the accused. Current law does not allow the government to introduce negative character evidence as to the accused unless the accused introduces evidence of good character. *See, e.g., United States v. Fountain,* 768 F.2d 790 (7th Cir. 1985) (when the accused offers proof of self-defense, this permits proof of the alleged victim's character trait for peacefulness, but it does not permit proof of the accused's character trait for violence).

Add. 10

The amendment makes clear that the accused cannot attack the alleged victim's character and yet remain shielded from the disclosure of equally relevant evidence concerning the same character trait of the accused. For example, in a murder case with a claim of self-defense, the accused, to bolster this defense, might offer evidence of the alleged victim's violent disposition. If the government has evidence that the accused has a violent character, but is not allowed to offer this evidence as part of its rebuttal, the jury has only part of the information it needs for an informed assessment of the probabilities as to who was the initial aggressor. This may be the case even if evidence of the accused's prior violent acts is admitted under Rule 404(b), because such evidence can be admitted only for limited purposes and not to show action in conformity with the accused's character on a specific occasion. Thus, the amendment is designed to permit a more balanced presentation of character evidence when an accused chooses to attack the character of the alleged victim.

The amendment does not affect the admissibility of evidence of specific acts of uncharged misconduct offered for a purpose other than proving character under Rule 404(b). Nor does it affect the standards for proof of character by evidence of other sexual behavior or sexual offenses under Rules 412-415. By its placement in Rule 404(a)(1), the amendment covers only proof of character by way of reputation or opinion.

The amendment does not permit proof of the accused's character if the accused merely uses character evidence for a purpose other than to prove the alleged victim's propensity to act in a certain way. *See United States v. Burks*, 470 F.2d 432, 434-5 (D.C.Cir. 1972) (evidence of the alleged victim's violent character, when known by the accused, was admissible "on the issue of whether or not the defendant reasonably feared he was in danger of imminent great bodily harm"). Finally, the amendment does not permit proof of the accused's character when the accused attacks the alleged victim's character as a witness under Rule 608 or 609.

The term "alleged" is inserted before each reference to "victim" in the Rule, in order to provide consistency with Evidence Rule 412.

**GAP Report--Proposed Amendment to Rule 404(a)**

The Committee made the following changes to the published draft of the proposed amendment to Evidence Rule 404(a):

**1.** The term "a pertinent trait of character" was changed to "the same trait of character," in order to limit the scope of the government's rebuttal. The Committee Note was revised to accord with this change in the text.

**2.** The word "alleged" was added before each reference in the Rule to a "victim" in order to provide consistency with Evidence Rule 412. The Committee Note was amended to accord with this change in the text.

**3.** The Committee Note was amended to clarify that rebuttal is not permitted under this Rule if the accused proffers evidence of the alleged victim's character for a purpose other than to prove the alleged victim's propensity to act in a certain manner.

2006 Amendments

The Rule has been amended to clarify that in a civil case evidence of a person's character is never admissible to prove that the person acted in conformity with the character trait. The amendment resolves the dispute in the case law over whether the exceptions in subdivisions (a)(1) and (2) permit the circumstantial use of character evidence in civil cases. *Compare Carson v. Polley*, 689 F.2d 562, 576 (5th Cir. 1982) ("when a central issue in a case is close to one of a criminal nature, the exceptions to the Rule 404(a) ban on character evidence may be invoked"), *with SEC v. Towers Financial Corp.*, 966 F.Supp. 203 (S.D.N.Y. 1997) (relying on the terms "accused" and "prosecution" in Rule 404(a) to conclude that the exceptions in subdivisions (a) (1) and (2) are inapplicable in civil cases). The amendment is consistent with the original intent of the Rule, which was to prohibit the circumstantial use of character evidence in civil cases, even where closely related to criminal charges. *See Ginter v. Northwestern Mut. Life Ins. Co.*, 576 F.Supp. 627, 629-30 (D. Ky.1984) ("It seems beyond peradventure of doubt that the

Add. 11

drafters of F.R.Evi. 404(a) explicitly intended that all character evidence, except where 'character is at issue' was to be excluded" in civil cases.

The circumstantial use of character evidence is generally discouraged because it carries serious risks of prejudice, confusion and delay. *See Michelson v. United States,* 335 U.S. 469, 476 (1948) ("The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."). In criminal cases, the so-called "mercy rule" permits a criminal defendant to introduce evidence of pertinent character traits of the defendant and the victim. But that is because the accused, whose liberty is at stake, may need "a counterweight against the strong investigative and prosecutorial resources of the government." C. Mueller & L. Kirkpatrick, *Evidence: Practice Under the Rules,* pp. 264-5 (2d ed. 1999). See also Richard Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic, and Injustice in the Courtroom,* 130 U.Pa.L.Rev. 845, 855 (1982) (the rule prohibiting circumstantial use of character evidence "was relaxed to allow the criminal defendant with so much at stake and so little available in the way of conventional proof to have special dispensation to tell the factfinder just what sort of person he really is"). Those concerns do not apply to parties in civil cases.

The amendment also clarifies that evidence otherwise admissible under Rule 404(a)(2) may nonetheless be excluded in a criminal case involving sexual misconduct. In such a case, the admissibility of evidence of the victim's sexual behavior and predisposition is governed by the more stringent provisions of Rule 412.

Nothing in the amendment is intended to affect the scope of Rule 404(b). While Rule 404(b) refers to the "accused," the "prosecution," and a "criminal case," it does so only in the context of a notice requirement. The admissibility standards of Rule 404(b) remain fully applicable to both civil and criminal cases.

**2011 Amendments**

The language of Rule 404 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (3048)

Fed. Rules Evid. Rule 404, 28 U.S.C.A., FRE Rule 404
Amendments received to 7-15-13

---

**End of Document**                                          © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 12